Anthony IADANZA and Tracy Iadanza, husband and wife, Plaintiffs,

v.

Lee W. MATHER, Jr., an individual, Lewis Realty, Inc., a Utah corporation, James W. Lewis, an individual, Jess Reid Real Estate, Ltd., a Utah limited partnership, and William R. "Dick" Stoner, an individual, Defendants.

No. 92–CV–1107W.

United States District Court, D. Utah, Central Division.

April 29, 1993.

Randall A. Mackey and Gifford W. Price, Salt Lake City, UT, for plaintiffs.

Robert M. Anderson, Salt Lake City, UT, for defendant Mather.

Edward M. Garrett, Salt Lake City, UT, for defendants Jess Reid Real Estate and Stoner.

Alan M. Metos, Salt Lake City, UT, for defendants Lewis Realty, Inc. and Lewis.

## MEMORANDUM DECISION AND ORDER

WINDER, District Judge.

This matter is before the court on the separate motions to dismiss brought by defendant Lee W. Mather, Jr. ("Mather") and defendants Jess Reid Real Estate and William R. "Dick" Stoner (collectively "Stoner"). A hearing on both motions was held on March 18, 1992. Mather was represented by Robert M. Anderson and Stoner was represented by Edward M. Garrett. Plaintiffs Anthony and Tracy Iadanza (collectively "Plaintiffs") were represented by Gifford W. Price, Thomas R. Taylor, and Randall A. Mackey. Although not directly involved in the motions before the court, defendants Lewis Realty, Inc. and James W. Lewis ("Lewis") were represented at the hearing by Allan M. Metos. Before the hearing, the court considered carefully the memoranda and other materials submitted by the parties. Since taking the matter under advisement, the court has further considered the law and facts relating to both motions. Now being

fully advised, the court renders the following Memorandum Decision and Order.

## I. BACKGROUND

In 1991, Mather listed a parcel of residential property for sale with defendant Lewis Realty, Inc. This property, known as Lot 29, is located in the Evergreen Subdivision of Deer Valley, Utah, which is adjacent to the Deer Valley Ski Resort ("Deer Valley"). In 1991 Plaintiffs' agents, Robert Morgan ("Morgan") and Steve Sauer ("Sauer"), made an offer to purchase Lot 29 on Plaintiffs' behalf. Real estate agents Lewis and Stoner presented this offer to Mather, and the parties commenced negotiations for the purchase of Lot 29 by Plaintiffs.[1] Plaintiffs conducted the negotiations through Morgan to avoid publicity "over the purchasers' true identity due to plaintiff Anthony Iadanza's celebrity status." Compl. ¶ 12, at 4. Plaintiffs allege Lewis and Stoner knew the actual purchaser of Lot 29 would be Plaintiffs, and "knew of the [P]laintiffs' privacy concerns and desire for seclusion at [Lot 29] and insistence on avoidance of publicity regarding their ownership and use of the Property." Id. ¶ 13, at 4. After the parties reached an agreement, Mather and Plaintiffs entered into an Earnest Money Sales Agreement on March 20, 1991 ("Sales Agreement"). The purchase of Lot 29 was closed on April 18, 1991.

Following the Plaintiffs' purchase of Lot 29, Deer Valley opened a ski path in the Evergreen Subdivision that provided several of the subdivision's lots, including Lot 29, with direct access to Deer Valley's ski runs. The ski trail is located on Deer Valley property directly behind and contiguous to Lot 29. The Complaint alleges:

1. Lewis acted as the listing agent for Lot 29, while Stoner was the selling agent.

2. The ski path at issue is to be distinguished from the ski easement that runs across a portion of Lot 28, the lot directly adjacent to Lot 29, and burdens Lot 28 in favor of Lot 29. On April 18, 1991, prior to the closing of the sale, Mather executed a Real Estate Transfer Disclosure Statement ("Disclosure Statement"). Section II, Part C, of the Disclosure Statement asks the seller, Mather, whether he is aware of any encroach-

At no time prior to the Closing or during the negotiations regarding the purchase of [Lot 29] did Mather or either of Mather's agents (Lewis or Stoner) tell the [P]laintiffs or either of the [P]laintiffs' agents (Morgan or Steve Sauer, Anthony Iadanza's personal manager), that a "ski trail," believed to be owned and maintained by the Deer Valley Ski Resort, would be or was planned to be constructed immediately contiguous to the rear boundary of the Property.

Id. ¶ 19, at 5. Plaintiffs claim they would not have purchased Lot 29 or would have insisted on a reduced purchase price had they known of Deer Valley's plans to construct the ski path.[2]

Plaintiffs filed suit against Mather, Lewis Realty, Inc., James R. Lewis, and Stoner. With regard to Mather and Stoner, the Complaint alleges as causes of action reckless misrepresentation, fraud, unfair and deceptive trade practices in violation of the Utah Consumer Sales Practices Act, breach of the covenant of good faith and fair dealing, detrimental reliance and unjust enrichment, and misrepresentation. Additionally, Plaintiffs allege a claim for breach of contract against Mather and a claim for breach of duty against Stoner. Mather and Stoner have moved to dismiss the Complaint in its entirety, with the exception that Stoner has not moved to dismiss Plaintiffs' eighth claim for relief for misrepresentation.[3]

## II. STANDARD OF REVIEW

In determining whether to grant a Rule 12 motion to dismiss the court looks solely to the material allegations of the complaint, and must accept all material allegations of the complaint as true. *Colman v. Utah State Land. Bd.*, 795 P.2d 622, 624–25

ments or easements that may affect the buyers' interest in the property. In response, Mather listed the "ski easement over adjoining lot # 28." Plaintiffs claim the Disclosure Statement makes no mention of the ski trail.

3. The court has not considered the effect on this litigation, if any, of the Sales Agreement's liquidated damages clause. This issue was raised for the first time at the hearing, was argued by only one party, and has not been briefed by any party.

(Utah 1990). In addition, all inferences that can be drawn from the allegations must be drawn in favor of the plaintiff. *Arrow Indus. v. Zions First Nat'l Bank,* 767 P.2d 935, 936 (Utah 1988). A motion to dismiss should be granted "where it appears to a certainty that the plaintiff would not be entitled to relief under any state of facts which could be proved in support of its claims." *Id.*

## III. DISCUSSION

### A. Claim for Unfair and Deceptive Trade Practices in Violation of the Utah Consumer Sales Practices Act

Both Mather and Stoner have moved to dismiss Plaintiffs' fifth claim for relief for the same reason: both argue the Utah Consumer Sales Practices Act, Utah Code Ann. §§ 13–11–1 to –23 (1992) ("CSPA"), does not apply to real estate transactions. Mem.Supp.M. Dismiss by Def. Stoner ("Stoner Mem.") at 9; Mem.Supp.M. Dismiss by Def. Mather ("Mather Mem.") at 8. Plaintiffs disagree, claiming that both the plain language of the CSPA and Justice Durham's concurring opinion in *Wade v. Jobe,* 818 P.2d 1006 (Utah 1991), show the CSPA applies to Plaintiffs' purchase of Lot 29 from Mather. For the following reasons, the court holds that Plaintiffs have stated a claim against Stoner for violation of the CSPA, but have failed to state such a claim against Mather.

#### 1. Defendant Stoner

■ By its express terms, the CSPA extends to any "consumer transaction," which the act defines as

a sale, lease, assignment, award by chance, or other written or oral transfer or disposition of goods, services, or other property, both tangible and intangible (except securities and insurance), to a person for primarily personal, family, or household purposes . . . or a solicitation or offer by a supplier with respect to any of these transfers or dispositions.

4. With all due respect to the defendants' memoranda, little, if any, assistance has been given by those memoranda to assist the court in its resolution of this issue.

Utah Code Ann. § 13–11–3(2) (1992). Based on this section, the court frames the issue before it as whether the phrase "property, both tangible and intangible" includes the sale of residential real estate such as Lot 29. The court has not found, and the parties have not cited, any controlling Utah law on this matter.[4] Therefore, the court must attempt to construe the CSPA in a manner in which the Supreme Court of Utah would, if faced with the same facts and issue. *High Plains Nat. Gas Co. v. Warren Petroleum Co.,* 875 F.2d 284, 287 (10th Cir.1989); *City of Aurora v. Bechtel Corp.,* 599 F.2d 382, 386 (10th Cir.1979). For the following reasons, the court concludes the CSPA applies to sales of residential real estate.

#### a. The Statute's Plain Meaning

■ The foremost rule of statutory construction is that the court "give effect to the intent of the legislature in light of the purpose the statute was meant to achieve." *Reeves v. Gentile,* 813 P.2d 111, 115 (Utah 1991); *see also Savage Indus., Inc. v. Utah State Tax Comm'n,* 811 P.2d 664, 670 (Utah 1991) (same); *American Coal Co. v. Sandstrom,* 689 P.2d 1, 3 (Utah 1984) (same). "[T]he starting point of any statutory interpretation is the language of the statute." *Marc Dev. Inc. v. FDIC,* 771 F.Supp. 1163, 1165 (D.Utah 1991). Where the statute's language is plain and unambiguous, the sole function of the court is to enforce the statute according to its terms. *Clover v. Snowbird Ski Resort,* 808 P.2d 1037, 1045 (Utah 1991).[5] "In construing legislative enactments, the reviewer assumes that each term in the statute was used advisedly; thus the statutory words are read literally, unless such reading is unreasonably confused or inoperable." *Savage Indus.,* 811 P.2d at 670; *see also Chris & Dick's Lumber v. Utah State Tax Comm'n,* 791 P.2d 511, 514 (Utah 1990) (court must "look to the plain meaning of the language at issue to discern the legislative intent.").

5. The federal rule is in accord. *See United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989); *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917).

Applying these rules to the CSPA, the court finds the phrase "property, both tangible and intangible" is not ambiguous, and in its "usual and accepted" meaning includes residential real property such as Lot 29.[6] The Random House Dictionary includes the following in its definitions of "property": "that which a person owns; the possession or possessions of a particular owner ... a piece of land or real estate...." The Random House Dictionary of the English Language 1550 (2d unabr. ed. 1987). Black's Law Dictionary defines "tangible property" as "[a]ll property which is touchable and has real existence (physical) whether it is real or personal." Black's Law Dictionary 1218 (6th ed. 1990). Under these or any other commonly accepted definition of property, residential real estate, such as Lot 29, is within the meaning of "consumer transaction" as used in the CSPA. Therefore, even were the court to end its inquiry here, the court would conclude the CSPA applied to the transaction at issue.[7]

### b. Legislative Definition of "Property"

While the Utah Legislature did not include a definition of "tangible property" in the CSPA's definition section, elsewhere the legislature has declared:

> (2) In the construction of these statutes, the following definitions shall be observed, unless the definition would be inconsistent with the manifest intent of the Legislature or repugnant to the context of the statute:

> . . . . .

> (h) "Land," "real estate," and "real property" include land, tenements, here-

---

ditaments, water rights, possessory rights, and claims.

. . . . .

> (p) "Property" includes both real and personal property.

Utah Code Ann. § 68–3–12 (Supp.1992). The Utah Supreme Court has looked to the general definitions found in section 68–3–12 to define otherwise undefined terms in other statutes, e.g., In re Erickson, 806 P.2d 1186, 1188 (Utah 1991) (construing probate statute), and it is appropriate for the court to look to these definitions in construing the CSPA.

Taken together with section 68–3–12, the term "property" as used in the CSPA includes both real and personal property, and therefore by reference includes "land, tenements, hereditaments, water rights, possessory rights, and claims." Utah Code Ann. § 68–3–12(p), –12(h) (Supp.1992) (emphasis supplied). In defining the term "land" for purposes of a mechanics lien statute, the Utah Supreme Court has noted: "The word 'land' as used in the law has since time immemorial been regarded as a generic term. It ... includes not only the soil, but everything attached to it, whether attached by the course of nature, as trees, herbage, and water, or by the hand of man, as buildings, fixtures, and fences." King Bros., Inc. v. Utah Dry Kiln Co., 440 P.2d 17, 19 (1968) (citation omitted). Applying these definitions to the words of the statute, the transaction at issue is within the jurisdiction of the CSPA.[8]

### c. Direction that the Court Liberally Construe the CSPA in Light of Legislative Objectives

■ Where, as here, a court is presented with a question of first impression, it is the

---

**6.** Finding no ambiguity in the CSPA, resort to legislative history would be inappropriate. *Johnson v. Utah State Retirement Bd.*, 770 P.2d 93, 95 (Utah 1988); *accord Toibb v. Radloff*, —— U.S. ——, ——, 111 S.Ct. 2197, 2200, 115 L.Ed.2d 145 (1991); *In re Harline*, 950 F.2d 669, 674 (10th Cir.1991).

**7.** While this conclusion might seem to endow the CSPA with a practically limitless reach, the legislature saw fit to otherwise confine the act's application notwithstanding its use of so extensive a term as property. For example, as discussed below, the legislature limited the CSPA's application to "suppliers," and specifically excluded cer-

tain types of property from the act's reach. *See* Utah Code Ann. §§ 13–11–3(2), –3(6), –22 (1992).

**8.** The conclusion that land is within the definition of property is so unmistakable as to be a view upon which other "truths do rest." William Wordsworth, *Intimations of Immortality* line 117 (1807). Absent express direction from Utah courts or legislature, for this court to conclude otherwise would require application of peculiar definitions of the CSPA's terms in contravention of the Utah Supreme Court's direction to the contrary. *See, e.g., Chris & Dick's Lumber*, 791 P.2d at 514.

court's duty to accord effect to a statutory provision requiring the statute to be construed liberally with a view to achieving the statute's object. *Brickyard Homeowners' Ass'n Man. Comm. v. Gibbons Realty Co.,* 668 P.2d 535, 538 (Utah 1983). The Utah Legislature included in the CSPA a directive that the "act be construed liberally to promote the following policies: ... (2) to protect consumers from suppliers who commit deceptive and unconscionable sales practices; [and] (3) to encourage the development of fair consumer sales practices...." Utah Code Ann. § 13–11–2 (1992). A narrow construction of the act not only would contravene this expressed legislative intent, but also might result in a greater incidence of fraudulent and unfair sales practices in the real estate industry.

The legislature also included in the CSPA a list of transactions that are beyond the act's reach. By its own terms the act does not apply to

(a) an act or practice required or specifically permitted by or under federal law, or by or under state law;

(b) a publisher, broadcaster, printer, or other person engaged in the dissemination of information or the reproduction of printed or pictorial matter so far as the information or matter has been disseminated or reproduced on behalf of others without actual knowledge that it violated this act;

(c) claim for personal injury or death or claim for damage to property other than the property that is the subject of the consumer transaction;

(d) credit terms of a transaction otherwise subject to this act; or

(e) any public utility subject to the regulating jurisdiction of the Public Service Commission of the state of Utah.

*Id.* § 13–11–22. Nor does the act apply to "securities and insurance." *Id.* § 13–11–3. The legislature's mandate of a liberal construction of the CSPA and failure to include real estate transactions in its detailed list of transactions not covered by the act strengthens the court's conclusion regarding that act.

### d. CSPA's Relationship With the Federal Trade Commission Act

One of the Utah Legislature's stated goals in enacting the CSPA was "to make state regulation of consumer sales practices not inconsistent with the policies of the Federal Trade Commission Act relating to consumer protection." *Id.* § 13–11–2(4). The Federal Trade Commission Act of 1914, 15 U.S.C.A. §§ 41–77 (1973 & Supp.1992) ("FTCA"), declares unfair methods of competition "in or affecting commerce," and unfair or deceptive acts or practices "in or affecting commerce," to be unlawful. *Id.* § 45(a)(1) (1973). Through the FTCA, Congress created and empowered the Federal Trade Commission ("FTC") to prevent such conduct. *Id.* § 45(a)(2).

The FTC's regulation of "commerce" involves numerous considerations not at issue here.[9] For purposes of construing the CSPA so as to be "not inconsistent" with the FTCA, the court need only note that the FTC has jurisdiction under the FTCA over any unfair or deceptive practice, including unfair or de-

---

**9.** The FTCA empowers the FTC to issue a complaint only when such an action would be "to the interest of the public." 15 U.S.C.A. § 45(b) (1973). Thus, protection of the public interest is a condition of the assumption of jurisdiction by the FTC. *See American Airlines, Inc. v. North American Airlines, Inc.,* 351 U.S. 79, 82, 76 S.Ct. 600, 603, 100 L.Ed. 953 (1956). The FTC may not use its authority to vindicate private interests. *E.g., FTC v. Klesner,* 280 U.S. 19, 27–28, 50 S.Ct. 1, 3–4, 74 L.Ed. 138 (1929).

A finding that with section 13–11–2(4) the Utah Legislature engrafted this public interest requirement onto the CSPA would be inconsistent with the terms of the CSPA. The CSPA includes detailed procedures by which the state and consumers may seek redress for an unconscionable

or deceptive practice or act by a supplier, including class action lawsuits. Utah Code Ann. §§ 13–11–7 to –21 (1992). The legislature's definition of what constitutes a "deceptive" act or practice does not include a consideration of the public interest. *See id.* § 13–11–4; *cf. Division of Consumer Protection v. GAF Corp.,* 760 P.2d 310, 315 (Utah 1988) (holding state properly stated claim under CSPA against shingle manufacturer; no discussion of "public interest" requirement in opinion). Moreover, the legislature intended only that the CSPA render Utah law consistent with the policies of the FTCA; the legislature did not enact the FTCA and all of that act's requirements for proceeding against a real estate developer.

ceptive practices in the real estate industry. *See id.* § 45(a)(1); *Southwest Sunsites, Inc. v. FTC,* 785 F.2d 1431, 1434–35 (9th Cir.) (reviewing FTC cease and desist order issued to land sale company), *cert. denied,* 479 U.S. 828, 107 S.Ct. 109, 93 L.Ed.2d 58 (1986); *Horizon Corp. v. FTC,* 1976–2 Trade Reg. Rep. (CCH) ¶ 61,155 (D.C.D.C.1976) (reviewing FTC subpoena issued to land sale company); 32 Fed.Proc.L.Ed. § 75:13, at 238 (1985) ("the FTC has jurisdiction over unfair and deceptive practices in the land sales industry").[10]

For example, in *In re Horizon Corp.,* 97 F.T.C. 464 (1981), the FTC ordered an Arizona land sales company to establish a $14.5 million trust fund to reimburse past purchasers of the company's real estate. This order resulted in part from the FTC's finding that "Respondent Horizon Corporation has engaged in the sale of land, located in the States of Texas, Arizona and New Mexico, and has utilized in connection therewith false, misleading, deceptive and unfair representations and acts and practices, and has failed to

disclose to purchasers material information in respect to such land." *Id.* at 778. In so ruling, the FTC rejected Horizon Corporation's argument that the FTC lacked jurisdiction over land sales transactions: "The aforementioned acts or practices ... constituted, and now constitute, unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce in violation of Section 5 of the Federal Trade Commission Act." *Id.*[11] Construing the CSPA so as to be "not inconsistent" with the policies of the FTCA, the court finds that the CSPA—like the FTCA—applies to real estate transactions.

### e. Uniform Consumer Sales Practices Act

The legislature did not create the CSPA from whole cloth, but modeled the Utah statute after the Uniform Consumer Sales Practices Act drafted by the National Conference of Commissioners on Uniform State Laws ("model CSPA"). *See* Uniform Consumer Sales Practices Act, 7A U.L.A. 233 (1985).[12]

**10.** In addition to giving the FTC broad enforcement powers under the FTCA, various members of Congress also have noted that the FTC's jurisdiction under the FTCA extends to real estate transactions. For example, in 1978, the House Subcommittee on Housing and Community Development held hearings regarding amendments to the Interstate Land Sales Full Disclosure Act, 15 U.S.C.A. §§ 1701–1720 (1982 & West Supp. 1992). During these hearings Representative Ashley, the Subcommittee Chairman, asked whether "since most consumer complaints regarding land sales appear to involve deceptive marketing practices, would it make sense to consolidate enforcement for fraud in the FTC instead of maintaining the dual jurisdiction involving both the FTC and HUD?" The Interstate Land Sales Full Disclosure Act Amendments: Hearing on H.R. 11265 Before the Subcomm. on Housing and Urban Affairs, 95th Cong., 2nd Sess. 669 (1978). Congress did not act on this suggestion.

**11.** Not only did the FTC proceed against Horizon Corporation, a land sales company, but apparently did so with vigor. The FTC's combined orders in the matter total 449 pages in volume 97 of the Federal Trade Commission Decisions.

**12.** The model CSPA is one of several model statutes addressing unfair or deceptive acts or practices in consumer transactions. In addition to that act, the National Conference of Commissioners on Uniform State Laws also has developed

the Uniform Deceptive Trade Practices Act ("UDTPA"). The UDTPA grants a cause of action to merchants against other merchants who obtain a competitive advantage through unfair trade practices. UDTPA, 7A U.L.A. § 3, at 236 (1985). While the model CSPA has been adopted by only three states, Ohio, Kansas, and Utah, the UDTPA has been adopted in at least eight states. *Id.* prefatory note at 29 (Supp.1992). The most widely adopted consumer protection statutes are those modeled after the Unfair Trade Practices and Consumer Protection Law developed by the Federal Trade Commission and the Committee on Suggested State Legislation of the Council of State Governments. *See* Council of State Governments, 1970 Suggested State Legislation: Unfair Trade Practices and Consumer Protection Law—Revision. This model act specifically applies to sales of "real property." *Id. See generally* S. Oppenheim, G. Weston, P. Maggs & R. Schechter, *Unfair Trade Practices and Consumer Protection* 685–755 (4th ed. 1983).

Because the UDTPA and Council of State Government's model statute use different language than the model CSPA, and because states rarely enact model legislation verbatim in any event, reliance on decisions construing these model acts is of only slight use in resolving the issue before the court. The enacted statutes' distinct wordings and legislative histories have resulted in a split among state courts on the general question whether state consumer protection laws apply to real estate transactions. *Compare Sohaey v. Van*

The drafters of the model CSPA made clear their intent that the model act not apply to real estate transactions: "On the assumption that land transactions frequently are, and should be, regulated by specialized legislation, they are excluded altogether" from the scope of the model act. *Id.* § 2, at 235 (comment to § 2(1)). The Utah Legislature, however, did not include this comment in its enactment of the CSPA, and the comment's absence in the Utah act reinforces the court's conclusion the CSPA applies to residential real estate transactions.

Moreover, in enacting the Utah CSPA the legislature eschewed the language of the model act's definition of "consumer transaction" in favor of a broader definition. The model CSPA defines that term as "a sale, lease, assignment, award by chance, or other disposition of an item of goods, a service, or an intangible [except securities] to an individ-

ual...." *Id.* § 2(1), at 234. In enacting the Utah version of the act, however, the legislature defined consumer transaction as "a sale, lease, assignment, award by chance, or other written or oral transfer or disposition of goods, services *or other property, both tangible and intangible* (except securities and insurance), to a person...." Utah Code Ann. § 13–11–3(2) (1992) (emphasis supplied). The legislature's amendment of the Utah CSPA to include a broader definition of consumer transaction than the model act provides support for the court's conclusion that the CSPA applies to the transaction before the court. *See Wade*, 818 P.2d at 1014 (Durham, J., concurring) ("The Utah Legislature's addition of the word 'tangible' to the language of the definition of consumer transaction is consistent with the conclusion that the Utah act was meant to apply to residential leases and other land transactions.").[13]

*Cura*, 240 Ill.App.3d 266, 180 Ill.Dec. 359, 378, 607 N.E.2d 253, 272 (1992) ("The Consumer Fraud Act applies to a real estate broker's representations to prospective purchasers of real estate.") *and Brandt v. Olympic Constr., Inc.*, 16 Mass.App.Ct. 913, 449 N.E.2d 1231, 1233 (1983) *with Owens v. Curtis*, 432 A.2d 737, 739 (D.C.Ct. App.1981) ("We hold that the sale of real estate is not within the meaning of 'primarily for personal, household or family use.'") (criticized in Russell B. Kinner, Peter Drymalski, and Sheila M. Barry, *Application of the District of Columbia Consumer Protection Procedures Act of 1976 to Residential Real Estate Transactions: A Critical Look at Owens v. Curtis*, 32 Cath.U.L.Rev. 851 (1983)).

As stated above, in addition to Utah, two other states—Kansas and Ohio—have enacted a form of the model CSPA. The Kansas legislature included a separate definition of "property" in its version of the act, and specifically included "real estate" within that definition. Kan.Stat.Ann. § 50–624(g) (1991). The Ohio legislature adopted the model CSPA's definition of consumer transaction: "sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual...." Ohio St.Ann. § 1345.01(A) (1992). Thus, Ohio's act differs from that enacted in Utah in this fundamental regard: the Utah CSPA applies to "tangible property," whereas the Ohio statute does not. *Compare* Utah Stat. Ann. § 13–11–3(2) (1992) *with* Ohio St.Ann. § 1345.01 (1992). Consequently, the Ohio act "has no application in a 'pure' real estate transaction," but "is applicable to the personal property or services portion of a mixed transaction involving both the transfer of personal property or services, and the transfer of real property."

*Brown v. Liberty Clubs, Inc.*, 45 Ohio St.3d 191, 543 N.E.2d 783, 785–86 (1989). Because of these differences in the definitions of "consumer transaction" in the Ohio and Kansas acts, they are of no help in resolving the issue before the court.

13. In her concurring opinion in *Jobe*, Justice Durham, joined by Justice Zimmerman, concluded the CSPA applied to landlord/tenant transactions. *Jobe*, 818 P.2d at 1016. While Justice Durham did not specifically consider the issue before this court, her opinion nevertheless provides support for this court's interpretation of the CSPA. Justice Durham noted many of the same arguments advanced here in favor of a broad reading of the term "consumer transaction":

One of the stated purposes of the UCSPA is "to protect consumers from suppliers who commit deceptive and unconscionable sales practices." Utah Code Ann. § 13–11–2(2). The legislative intent behind the model consumer protection laws was to balance the unequal bargaining positions between supplier and consumer. The tenant is entitled to protection under these remedial laws as much as any other consumer. In view of (1) the legislature's mandate to construe the UCSPA liberally, (2) the stated purpose of keeping Utah law consistent with the F.T.C. Act and the consumer protection laws of other states, and (3) the absence of any language or other expression of legislative intent to the contrary, this author and Justice Zimmerman would hold that the renting of residential housing is a consumer transaction within the meaning of the UCSPA. *Id.* at 1016. That Justice Durham's opinion regarding the CSPA garnered only one other vote does not indicate that a majority of the court

### 2. Defendant Mather

■ Although Mather has not raised the issue, the court notes the CSPA extends liability to "suppliers," Utah Code Ann. § 13–11–4, –5 (1992), and defines that term as "a seller, lessor, assignor, offeror, broker, or other person who *regularly* solicits, engages in, or enforces consumer transactions...." *Id.* § 13–11–3(6) (emphasis supplied). In their Complaint, Plaintiffs' fail to allege that Mather regularly engages in or otherwise participates in real estate transactions; therefore, Plaintiffs have failed to state a claim for relief under the CSPA against Mather. *Cf. Young v. Joyce*, 351 A.2d 857, 860 (Del.1975) (holding Delaware Consumer Fraud Act inapplicable to "isolated sale or real estate by its owner").

### B. Claim for Fraud

■ To state a claim for fraud under Utah law Plaintiffs must allege:

(1) That a representation was made; (2) concerning a presently existing material fact; (3) which was false; (4) which the representor either (a) knew to be false, or (b) made recklessly, knowing that he had insufficient knowledge upon which to base such representation; (5) for the purpose of inducing the other party to act upon it; (6) that the other party, acting reasonably and in ignorance of the falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his injury and damage.

*Pace v. Parrish*, 247 P.2d 273, 274–75 (Utah 1952); *see also Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 800 (Utah 1991). Under Rule 9 of the Federal Rules of Civil Procedure, "the circumstances constituting fraud ... shall be stated with particularity." Fed.R.Civ.P. 9.[14]

As a threshold matter, the court notes that Plaintiffs have stated each of the *Pace* elements in their Complaint. Plaintiffs allege: (1) "During the course of the negotiations regarding the purchase of [Lot 29] with Mather, Lewis, and Stoner, representations were made to plaintiff Anthony Iadanza and his agent Steve Sauer, among others"; (2) "concerning presently existing material facts related to there being no planned construction or development between the rear boundary of [Lot 29] and the top of the hill behind [Lot 29] or any other concerns impacting the privacy of the [P]laintiff's home"; Compl. ¶ 48, at 13; (3) that "were false"; *id.* ¶ 49, at 13; (4) that "Mather, Lewis, and Stoner either knew their representations were false, or recklessly made such representations knowing that they had insufficient knowledge and information upon which to base such representations; *id.* ¶ 50, at 13; (5) "for the purpose of inducing the [P]laintiffs to act thereon"; *id.;* (6) that Plaintiffs "reasonably relied on and acted upon such representations being true"; *id.* ¶ 51, at 14; (7) and (8) that the false statements "induced the [P]laintiffs to act thereon and purchase" Lot 29; *id.;* and ·(9) that "[a]s a result of the [P]laintiffs' reliance upon the false representations and misleading omissions made by Mather, Lewis, and Stoner, the [P]laintiffs have suffered substantial damages in an amount of at least $50,000." *Id.* ¶ 53, at 14. As discussed below, the court finds these allegations state a claim for relief against Stoner, but fail to allege a claim against Mather.[15]

### 1. Defendant Mather

■ Although the Complaint includes Mather in its recitation of the elements of

disagrees with a broad reading of the act. The three justices who did not join in the part of Justice Durham's opinion addressing the CSPA "express[ed] no opinion on [that portion] of Justice Durham's opinion since it appears to [us] that it is not necessary to consider the UCSPA to give the tenant the relief to which she is entitled." *Id.* at 1018 (Howe, A.C.J., concurring, joined by Hall, C.J., and Stewart, J.).

14. Although Utah law governs the burden of proving fraud at trial, "the procedure for pleading fraud in federal courts in all diversity suits is governed by the special pleading requirements of Federal Rule of Civil Procedure 9(b)." *Hayduk*

*v. Lanna*, 775 F.2d 441 (1st Cir.1985); ·*see also Simcox v. San Juan Shipyard, Inc.*, 754 F.2d 430, 439 n. 9 (3rd Cir.1985); 5 Charles Wright and Alan Miller, *Federal Practice and Procedure*, § 1297, at 583 (1990) ("Since Rule 9(b) is a special pleading requirement, it concerns procedure in the federal courts and should govern in ·all diversity suits.").

15. Stoner and Mather claim the Complaint should be dismissed because Plaintiffs have not sufficiently differentiated among the multiple defendants in this case. The court rejects this' argument. Plaintiffs have distinguished the de-

fraud, after the hearing on this matter counsel for Plaintiffs notified the court "that Mr. Mather was not physically present on any occasion with any of those set forth above [Anthony Iadanza, Tracy Iadanza, Sauer, and Morgan], nor did he have any oral conversation with Tracy Iadanza or Messrs. Sauer or Morgan, and no oral conversation with Mr. Iadanza wherein there was discussion relative to construction or development behind [Lot 29]." Letter from Gifford W. Price to the Court (March 18, 1993) ("Price Letter"). Having admitted that Mather made no verbal representation to Plaintiffs or their agents, to meet the requirements established in *Pace* Plaintiffs must allege that Mather either made a written representation to Plaintiffs or their agents, or violated a duty to disclose the information. *First Sec. Bank of Utah v. Banberry Dev.*, 786 P.2d 1326, 1328–29 (Utah 1990); *Sugarhouse Fin. Co. v. Anderson*, 610 P.2d 1369, 1373 (Utah 1980).

Even reading the Complaint in the light most favorable to Plaintiffs, Plaintiffs have failed to allege that Mather made a written representation to Plaintiffs that was fraudulent.[16] In fact, in their fraud claim Plaintiffs do not allege that any of Mather's written statements, such as the Disclosure State-

ment, was fraudulent, but that the allegedly fraudulent statements "were made to plaintiff Anthony Iadanza and his agent, Steve Sauer, among others, while physically inspecting the property...." Compl. ¶ 48, at 13. Given the admission in the Price Letter that Mather was not present on any occasion with Plaintiffs, Sauer, or Morgan when there was discussion about construction or development behind Lot 29, Plaintiffs have failed to state a claim for relief for fraud against Mather.[17]

### 2. Defendant Stoner

■ Stoner argues Plaintiffs' fraud claim should be dismissed because this claim presents "a conclusion without explanation and does not meet the elements test of fraud," and "we are not enlightened as to how a ski trail impacts the privacy of plaintiffs['] home." Stoner Mem. at 8.[18] In light of the detailed allegations of fraud contained in the Complaint, the court rejects these arguments. Paragraphs 47 through 54 of the Complaint state in detail the elements of a fraud claim against Stoner. Of particular note, Plaintiffs claim that Stoner and JR Real Estate "either knew their representations were false, or recklessly made such

---

fendants by name and need do no more in their Complaint.

**16.** The allegation that comes closest to such a claim is the following:

In the Disclosure Statement Mather, Lewis, and Stoner misrepresented to the [P]laintiffs and their agents the encroachments, easements, and similar matters affecting the [P]laintiffs' interest in the Property by voluntarily referring to factors existing outside of the boundaries of the Property, such as the "ski easement over adjoining lot #28," *without also referring* to the ski trail planned to be constructed immediately contiguous to the rear boundary of the Property.

Compl. ¶ 29, at 8 (emphasis supplied). This allegation, which is referenced in Plaintiffs' fraud claim, does not claim with particularity that Mather's statement regarding the ski easement was itself fraudulent, but that Mather failed to "also refer" to the ski trail. Utah courts have made clear that to allege a claim for fraud based on a failure to disclose, Plaintiffs must allege Mather owed then a duty to disclose the information. *See DeBry v. Valley Mortgage Co.*, 835 P.2d 1000, 1008 (Utah Ct.App.1992). The Complaint makes no such allegation, and therefore Plaintiffs can prove no set of facts consistent with the Complaint that would entitle them to relief.

**17.** Plaintiffs cannot rely on their claim for fraud against Stoner as a basis for a fraud claim against Mather. *Israel Pagan Estate v. Cannon*, 746 P.2d 785, 792 (Utah Ct.App.1987) ("A person cannot be liable for fraud unless he made the false representations himself, authorized someone to make them for him, or participated in the misrepresentation in some way, as through a conspiracy."), *cert. dismissed sub nom.*, *Israel Pagan Estate v. Capital Thrift and Loan*, 771 P.2d 1032 (Utah 1989); *cf.* Restatement (Second) of Torts § 525 (1977) (noting liability for fraud extends only to "[o]ne who fraudulently makes a misrepresentation of fact, opinion, intention or law...."); 37 C.J.S. Fraud § 61 (1943). Plaintiffs have not alleged that Mather authorized Stoner to make the allegedly fraudulent statements to Plaintiff or otherwise participated in Stoner's allegedly fraudulent activity in any way.

**18.** Stoner also argues: "We note at this point that there is no suggestion in any of the [p]aragraphs that representations were made to Tracy Iadanza. Without some allegation as to her involvement, her case must be dismissed." Stoner Mem. at 8. Stoner has cited no authority for this proposition, and the court is hesitant to decide a motion to dismiss a claim that the movant admits is not in the Complaint.

representations knowing that they had insufficient knowledge and information upon which to base such representations for the purpose of inducing the [P]laintiffs to act thereon." Compl. ¶ 50, at 13. Elsewhere in the Complaint Plaintiffs allege Stoner "represented to plaintiff Anthony Iadanza and his personal manager, Steve Sauer, that [he] had knowledge of Deer Valley Resort's development plan around and behind [Lot 29], but nevertheless made false statements and misrepresentations ... regarding there being no planned construction or development between the rear boundary of [Lot 29] and the top of the hill behind the Property." *Id.* ¶ 21, at 5–6. These statements meet the requirements of *Pace* and Rule 9 and give the defendants sufficient notice of the basis of the Plaintiffs' fraud claim.

 Stoner's argument that Plaintiffs have failed to explain "how a ski trail impacts the privacy of [P]laintiffs' home" does not affect the court's conclusion that Plaintiffs have stated a claim for fraud against Stoner. The argument ignores both the requirements of Rule 9 and numerous allegations of the Plaintiffs' Complaint. Rule 9 does not require a Plaintiff to plead general damages with particularity, but only claims of special damages. Fed.R.Civ.P. 9(g). Moreover, Rule 9's requirement that Plaintiffs plead the "circumstances constituting fraud" with particularity refers to matters "such as the time,

place, and contents of the false representations, as well as the identity of the person making the misrepresentations and what he obtained thereby." 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1297, at 590 (1990). Plaintiffs have provided the defendants with this information and more.[19] Regarding the damage suffered by Plaintiffs as a result of the construction of the ski trail, the Complaint includes the following:

> During the ski season, the subject ski trail is used by the public to gain access to the "Last Chance" ski run at the Deer Valley ski resort. In the spring, summer, and fall, the subject ski trail is used by the public as a hiking and nature trail, as well as being used by mountain bikers, and motorized dirt bikers for recreational activities. In addition, on information and belief, the [P]laintiffs also believe that the subject ski trail is used by horseback riders during the spring, summer, and fall.

Compl. ¶ 36, at 10. Requiring Plaintiffs to go beyond these statements in describing their fraud claim would necessitate the pleading of evidence, a result contrary to the intent of Rule 9.[20] Given these considerations, the court rejects Stoner's arguments that Plaintiffs' fraud claim against them should be dismissed.[21]

19. The court also refers Stoner to Form 13 of the Appendix of Forms attached to the Federal Rules of Civil Procedure. Rule 84 declares that Form 13 is sufficient under the rules and is "intended to indicate the simplicity and brevity of statement which the rules contemplate." Fed.R.Civ.P. 84. The damages statement contained in Form 13 provides no more information than does Plaintiffs' Complaint.

20. Stoner correctly states the *Pace* rule that the measure of damages " 'for fraud is the difference between [the] value of property purchased and [the] value it would have had if representations were true.' " Stoner Mem. at 5 (quoting *Pace,* 247 P.2d at 277). Defendants then attempt to carry this rule beyond its logical foundations by arguing "the only mention of money damages in the Complaint is Paragraph 53 which alleges that [P]laintiffs suffered damages of at least $50,-000.00. We are not advised as to the nature or elements of that claim. The prayer of the Complaint simply requests damages to be determined at the time of trial." *Id.* The rule expressed in

. *Pace* does not contemplate that Plaintiffs must predict the trier of fact's determination of damages and does not require Plaintiffs to recite their entire case-in-chief at this stage of the proceedings. Rather, all the law requires is that Plaintiffs claim the alleged fraud induced them to act to their injury and damage. *Cf. Dugan v. Jones,* 615 P.2d 1239, 1246 (Utah 1980). Stoner cites no authority to the contrary.

21. While the court disagrees with Mather's and Stoner's arguments that Plaintiffs have failed sufficiently to allege damages in their Complaint, the court agrees that Plaintiffs must file and serve unredacted versions of their Complaint and exhibits. United States Court for the District of Utah Local Rule 118 provides that court documents are matters of public record unless ordered sealed by the court. The secrecy provision of Rule 118 is available to all litigants, including Plaintiffs, and it is not appropriate for Plaintiffs unilaterally to mask portions of documents filed with the court.

## C. Claim for Reckless Misrepresentation

 Under Utah law, to state a claim for misrepresentation the Plaintiffs must allege:

"(1) one having a pecuniary interest in a transaction, (2) is in a superior position to know material facts, and (3) carelessly or negligently makes a false representation concerning them, (4) expecting the other party to rely and act thereon, and (5) the other party reasonably does so and (6) suffers loss in that transaction...."

*DeBry,* 835 P.2d at 1008 (quoting *Jardine v. Brunswick Corp.,* 18 Utah 2d 378, 423 P.2d 659, 662 (1967)). Taken at face value, Plaintiffs' Complaint alleges each of these elements against Mather and Stoner. Plaintiffs allege the defendants (1) "each had a pecuniary interest in this transaction," (2) "were each in a superior position to know and each knew the material facts," (3) "recklessly made affirmative false representations concerning those facts," (4) intended "that the [P]laintiffs and the [P]laintiffs' agents (Morgan and Steve Sauer) would rely and act thereon," (5) that "[P]laintiffs justifiably and reasonably relied on those affirmative false representations," and (6) that Plaintiffs "have been damaged as a proximate result of such reliance." Compl. ¶ 41, at 11.

### 1. Defendant Stoner

Stoner makes two arguments that Plaintiffs' misrepresentation claim should be dismissed. First, he claims Plaintiffs' agent was aware of Deer Valley's plans regarding the ski trail and therefore no misrepresentation took place. To support this claim, Stoner points to a letter written by Stoner to Morgan on March 19, 1991 ("Stoner Letter"). Attached to the Stoner Letter is a map ("Stoner Map") that Stoner claims shows the planned construction of the ski trail, and indicates that the trail will be immediately contiguous to the rear boundary of Lot 29. The Stoner Letter states the Stoner Map "will show the future ski path development for access to [L]ot # 29. The exact location has not been decided." Stoner Letter. Stoner claims this statement and the Stoner Map gave Plaintiffs notice, through their agent Morgan, of the proposed ski trail.

Plaintiffs contest this reading of the Stoner Letter and Map, arguing that both are "intentionally ambiguous" and refer to the ski easement over Lot 28, not to the proposed ski trail. Compl. ¶ 33, at 9.

This dispute over the interpretation of the Stoner Letter and Map disregards the procedural posture of this case. On a motion to dismiss the court cannot weigh the evidence and determine whether the Stoner Letter gave Plaintiffs notice of the ski trail. The statements in that document and the accompanying map are not so clear that they are immune from disputed interpretations. Therefore, the arguments regarding the Stoner Letter and Map and whether Plaintiffs were on notice of Deer Valley's plans to build the ski trail present questions for the trier of fact. *E.g., Berkeley Bank for Coops. v. Meibos,* 607 P.2d 798, 801 (Utah 1980) (issues of actual reliance, reasonableness of reliance, character of representations, and circumstances of alleged misrepresentation present jury questions); *Condas v. Adams,* 15 Utah 2d 132, 388 P.2d 803, 805 (1964) (whether seller misrepresented particulars of property presented question for jury); *accord St. Joseph's Hosp. and Medical Ctr. v. Reserve Life Ins. Co.,* 154 Ariz. 307, 742 P.2d 808, 815 (1987) (what is reasonable conduct in case alleging misrepresentation "is usually to be resolved by the jury"); *Stauth v. Brown,* 241 Kan. 1, 734 P.2d 1063, 1068–69 (1987) (same); *Epperson v. Roloff,* 102 Nev. 206, 719 P.2d 799, 803 (1986) (whether party had notice of defect in home was question for jury); *McJunkin v. Kaufman and Broad Home Sys., Inc.,* 229 Mont. 432, 748 P.2d 910, 919 (1987) (claim that seller of home misrepresented information to buyer presented question for jury). *See generally* Restatement (Second) of Torts § 552 comment e (1977).

 Stoner's second argument in favor of the motion to dismiss the misrepresentation claim is that the Complaint makes "no attempt to separate the [P]laintiffs and their agents or to allege that any representations made to the agents were in fact communicated to the [P]laintiffs." Stoner Mem. at 7. Stoner cites no authority in support of the proposition that disclosure of the representa-

tion by an agent to the principal is an element of a claim for misrepresentation. Rather, the law appears to be to the contrary, *see* authorities cited *supra* footnote 4, and the court rejects Stoner's argument as being without support. At this stage of the proceedings, Plaintiffs' reckless misrepresentation claim against Stoner survives.

### 2. Defendant Mather

Mather makes two arguments that Plaintiffs' reckless misrepresentation claim against him should be dismissed. First, Mather argues the Stoner Letter gave Plaintiffs notice of the proposed ski trail. The court already has rejected this argument in its discussion of Stoner's motion to dismiss, and rejects Mather's argument for the same reasons.[22] Second, Mather claims "no decrease in the actual value of Lot 29 is alleged in these [misrepresentation and fraud] counts, and therefore no damages may be awarded." Mather Mem. at 7. The court rejects this argument. The claim for misrepresentation states Plaintiffs relied on Mather's alleged misrepresentations and "have been damaged as a proximate result of such reliance." Compl. ¶ 41, at 11. Moreover, in their prayer for relief Plaintiffs pray for relief "[u]nder the First Claim for Relief [reckless misrepresentation] that the [P]laintiffs have and recover from Mather . . . all damages resulting from the reckless misrepresentations, as alleged herein, in an amount to be determined at the trial of this matter." *Id.* ¶ 72(A), at 17. These allegations are sufficient to state a claim for damages for reckless misrepresentation, and meet the requirements set forth in *DeBry*, 835 P.2d at 1008, and *Jardine*, 423 P.2d at 662.[23]

### D. Claim for Breach of Duty Against Stoner

■ In this claim, Plaintiffs allege Stoner and JR Real Estate breached a duty of "good faith and due care and to fully disclose to the [P]laintiffs all relevant information pertaining to [Lot 29] that they possessed or that they would have possessed had they properly performed their duties owed to the [P]laintiffs." Compl. ¶ 44, at 12. Stoner claims this allegation is insufficient because he was Mather's agent and therefore owed Mather "the major duty," and in any event Stoner disclosed the ski trail to Plaintiffs in the Stoner Letter. The court already has rejected the argument based on the Stoner Letter, and therefore turns to the question of the duty owed to a buyer by the seller's agent.

■ While a seller's real estate agent does not act in a fiduciary capacity to the buyer, *Rogers v. Division of Real Estate*, 790 P.2d 102, 107 (Utah Ct.App.1990), Utah law requires real estate agents to meet standards of "honesty, integrity, truthfulness, reputation, and competency." Utah Code Ann. § 61-2-6(1) (1989). The Utah Supreme Court has determined that a seller's agent is liable to a buyer for violation of this statutory standard. *Dugan*, 615 P.2d at 1248 (construing identical language in predecessor statute); *see also In re Topik*, 761 P.2d 32, 36 (Utah Ct.App.1988), *cert. denied*, 773 P.2d 45 (Utah 1989) (Table). Thus, Stoner's claim that he owed "the major duty" to Mather is irrelevant; Plaintiffs allege that Stoner failed "to act honestly and truthfully, and perform this real estate transaction with integrity and competence." Compl. ¶ 45, at 12. Under *Dugan*, this allegation states a claim for breach of Stoner's duty under section 61-2-6(1).

22. Unlike Stoner, Mather supports his argument by citing *Pace* and *Toomb v. Hepworth*, 737 P.2d 657, 659 (Utah Ct.App.1987), for the proposition that "there can be no claim for misrepresentation where the correct information is provided prior to the closing of a transaction, or where information is provided to place a reasonable person on inquiry notice that prior information or statements are erroneous." Mather Mem. at 5–6. While this may be a correct statement of the law, *Hepworth* involved the trial court's grant of summary judgment and *Pace* was an appeal

following a jury verdict; thus, they provide Mather no support for dismissal of the misrepresentation claim at this stage of the proceedings.

23. The effect of the Price Letter on Plaintiffs' misrepresentation claims has not been briefed by the parties, and the court makes no comment on the issue. The parties have not raised, and the court has not considered, whether Plaintiffs may bring claims both for "reckless misrepresentation" and "representation."

**E. Claim for Breach of Contract Against Mather**

Plaintiffs allege Mather breached paragraph 8.1 of the Sales Agreement by failing to disclose in the Disclosure Statement Deer Valley's plans to build the ski trail.[24] Plaintiffs allege the Sales Agreement "contemplates [the Disclosure Statement] becoming part of the Sales Agreement", and, therefore, the alleged misrepresentations and omissions in the Disclosure Statement constitute a breach of the Sales Agreement. Mather responds that this claim should be dismissed for three reasons. The first reason is based on the Stoner Letter, an argument the court already has rejected. Mather's second reason is that Mather did not breach the Sales Agreement because he did not promise Lot 29 would constitute a "tranquil, private retreat." Mather Mem. at 7. Mather emphasizes that the Sales Agreement contains no promises regarding Deer Valley's development plans for the ski trail. Plaintiffs do not contend that Mather breached the Sales Agreement by breaking a promise that Deer Valley would not build the ski trail, however. Rather, they contend Mather breached the Sales Agreement by failing to disclose his knowledge of such plans in the Disclosure Statement. Thus, the issue is whether the alleged failure to completely and accurately fill out the Disclosure Statement constitutes a breach of the Sales Agreement.

■■■■■ "Contracting parties can incorporate by reference other documents and make the documents incorporated by reference part of the contract." *Zions First Nat. Bank v. Allen*, 688 F.Supp. 1495, 1498 (D.Utah 1988). Whether a document is made part of the contract is determined by the intentions of the parties. *See Winegar v.*

*Froerer Corp.*, 813 P.2d 104, 108 (Utah 1991). "If the contract is in writing and the language is not ambiguous, the intention of the parties must be determined from the words of the agreement." *Id.* The court may look to extrinsic evidence only if careful consideration reveals that the contract language is ambiguous. *Atlas Corp. v. Clovis Nat'l Bank*, 737 P.2d 225, 229 (Utah 1987); *Faulkner v. Farnsworth*, 665 P.2d 1292, 1293 (Utah 1983). "A contract provision is ambiguous if it is capable of more than one reasonable interpretation because of " 'uncertain meanings of terms, missing terms, or other facial deficiencies.' " *Winegar*, 813 P.2d at 108 (quoting *Faulkner*, 665 P.2d at 1293).[25] Whether ambiguity exists is a question of law. *Id.*

■■■■■ With these considerations in mind, the court holds the parties intended the Purchase Agreement to be incorporated into the Sales Agreement. Documents that are part of the same real estate transaction and that are rendered "substantially contemporaneously and are clearly interrelated ... must be construed as a whole and harmonized, if possible." *Verhoef v. Aston*, 740 P.2d 1342, 1344 (Utah Ct.App.1987) (citing *Atlas Corp.*, 737 P.2d at 229). Under Section 8.1 of the Sales Agreement, Mather agreed to provide Plaintiffs "a fully completed and signed copy" of the Disclosure Statement. The Disclosure Statement requests that Mather provide information regarding "[a]ny encroachments, easements or similar matters that may affect your interest in the subject property," and "[n]eighborhood noise problems or other nuisances." Disclosure Statement Questions II(C)(3) & (11). Plaintiffs' fourth claim for relief alleges that Mather failed to

---

**24.** Paragraph 8.1 provides in full:

8.1 Seller agrees to provide to Buyer, within 10 (ten) business days after Seller's acceptance of this offer, the following materials: (a) a Commitment for Title Insurance in the amount of the Purchase Price on the subject property; (b) copies of all CC & R's affecting the property; (c) a copy of the certified survey of the subject property used by Seller in the construction of the residence on the subject building lot; (d) a copy of any soils test data prepared for or used by Seller associated with the construction of the residence on the subject building lot; and (e) a fully completed and

signed copy of the attached Real Estate Disclosure Statement. This offer is subject to Buyer's approval of the content of each of the items referenced in this subsection 8.1 to determine, in Buyer's sole discretion, if the content of all of the above items is acceptable. Sales Agreement ¶ 8.1 (attached as Exhibit A to the Compl.).

**25.** A contract is not rendered ambiguous merely because the parties attach different meanings to its terms. *Buehner Block Co. v. UWC Assoc.*, 752 P.2d 892, 895 (Utah 1988).

fully answer these questions, and therefore failed to provide Plaintiffs with a "fully complete" Disclosure Statement as required by section 8.1 of the Sales Agreement. This allegation states a claim for breach of contract against Mather sufficient to survive a motion to dismiss.

Mather's third argument in support of his motion to dismiss the claim for breach of contract is that Plaintiffs "do not allege in this count that the actual value of Lot 29 was adversely affected by the ski path." Mather Mem. at 8. It is axiomatic that if Plaintiffs have not alleged damage as a result of the alleged breach, they have failed to state a claim for breach of contract. *E.g.,* 5 *Corbin on Contracts* § 1003 (1964 & Supp.1992). Contrary to Mather's contention, however, in their fourth claim for relief Plaintiffs allege that Mather's breach of the Sales Agreement "has caused damage to the [P]laintiffs." Compl. ¶ 57, at 14. Paragraph 20 of the Complaint, which is incorporated by reference in the fourth claim for relief, claims that had Mather disclosed Deer Valley's plans to build the ski trail, Plaintiffs "would have terminated negotiations regarding the purchase of [Lot 29] or insisted on a substantially lower purchase price because of [Lot 29's] reduced value to the [P]laintiffs." *Id.* ¶ 20, at 5. The court finds these allegations are sufficient to state a claim for relief for breach of contract.

### F. Claim for Breach of the Covenant of Good Faith and Fair Dealing

Both Mather and Stoner have moved to dismiss Plaintiffs' claim for breach of the covenant of good faith and fair dealing. Mather argues that "Utah courts have held that no duty of good faith and fair dealing arises apart from the terms of a contract ... [and] the contract between the parties does not include a promise regarding the expansion plans of Deer Valley ski resort, or a guarantee that no ski path would be opened behind Lot 29." Mather Mem. at 8–9 (citations omitted). Stoner repeats essentially the same argument, claiming Plaintiffs "cannot legally assert the breach of covenant as a separate independent cause of action for which they seek damage." Stoner Mem. at

9–10. Relying on *Brehany v. Nordstrom,* 812 P.2d 49 (Utah 1991), Plaintiffs respond they are not seeking to create new rights not found in the Sales Agreement, but "are seeking redress for defendants' breach of the covenant implied in the sales transaction." Mem. Opp. Def.s' Mot. Dismiss at 5–6.

In resolving these arguments, the court benefits from clearly established Utah law regarding the covenant of good faith and fair dealing. In *Brehany,* the Utah Supreme Court stated:

Here, the plaintiffs correctly observe that every contract is subject to an implied covenant of good faith. For example, in *Resource Management Co. v. Weston Ranch & Livestock Co.,* 706 P.2d 1028, 1037 (Utah 1985), the Court, in referring to the implied covenant of good faith, stated that, "courts endeavor to construe contracts so as not to grant one of the parties an absolute and arbitrary right to terminate a contract." *See also Beck v. Farmer's Ins. Exch.,* 701 P.2d 795, 797–98 (Utah 1985)..

. . . . .

Under the implied covenant of good faith applied in *Resource Management,* the parties to a contract are deemed to intend that the terms of a contract should be construed in a matter which assumes the parties intended that the duties and rights created by the contract should be performed and exercised in good faith. Such a covenant cannot be construed, however, to establish new, independent rights or duties not agreed upon by the parties.

812 P.2d at 55. In *St. Benedict's Dev. v. St. Benedict's Hosp.,* 811 P.2d 194 (Utah 1991), the court addressed a claim similar to that asserted by defendants. In *St. Benedict's,* plaintiff, a developer of office buildings serving doctors at a hospital, brought suit against the hospital and a second developer when the hospital engaged the second developer to construct a new office building. *Id.* at 196. Plaintiff alleged construction of the new office building would violate plaintiff's contract with the hospital and constitute intentional interference with economic relations. The trial court dismissed plaintiff's claim for breach of the implied covenant of good faith

and fair dealing, and plaintiff appealed. *Id.* at 196–97.

On appeal the Utah Supreme Court reversed, holding the plaintiff's complaint had stated a claim for relief for violation of good faith and fair dealing, notwithstanding plaintiff's concurrent claim for breach of contract. *Id.* at 200. In so holding, the court stated:

> Under the covenant of good faith and fair dealing, each party impliedly promises that he will not intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract. A violation of the covenant gives rise to a claim for breach of contract.

*Id.* at 199–200 (citations omitted). Thus, Stoner's claim that Plaintiffs "cannot legally assert the breach of covenant as a separate independent cause of action for which they seek damage," Stoner Mem. at 9–10, is an incorrect statement of the law. Based on *St. Benedict's*, Plaintiffs can properly allege a claim for breach of the implied covenant of good faith notwithstanding their concurrent claim for breach of the Sales Agreement.

The court likewise rejects the defendants' arguments that Plaintiffs have not sufficiently plead their claim for breach of the implied covenant of good faith and fair dealing. Mather states that no such violation could have occurred because "the contract between the parties does not include a promise regarding the expansion plans of Deer Valley ski resort, or a guarantee that no ski path would be opened behind Lot 29." Mather Mem. at 8–9. This argument ignores the rule that "[a]n examination of the express contract terms alone is insufficient to determine whether there has been a breach of the implied covenant of good faith and fair dealing." *St. Benedict's*, 811 P.2d at 200 (citing S. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94

Harv.L.Rev. 369, 371 (1980)); *see also Beck*, 701 P.2d at 798 (violation of duty of good faith and fair dealing gives rise to claim for breach of contract). The conceptual foundation for a party's duty to act in good faith in the performance of contractual obligations does not arise from the contract itself, but from the overriding public policy in promoting the creation of and reliance on contracts and the public's interest in promoting fairness and reasonableness in commercial transactions. Thus, the duty of good faith "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Restatement (Second) of Contracts § 205 comment a (1981).[26] "To comply with his obligation to perform a contract in good faith, a party's actions must be consistent with the agreed common purpose and the justified expectations of the other party." *St. Benedict's*, 811 P.2d at 200.

To state a claim for breach of the covenant of good faith and fair dealing, Plaintiffs must allege that Mather and Stoner "intentionally or purposely" acted to destroy Plaintiffs' "right to receive the fruits of the contract." *Id.* at 199. While the court recognizes that Plaintiffs' claim for breach of the covenant of good faith is brief, that claim incorporates by reference other statements that, taken as a whole, state a claim for relief sufficient to withstand Mather's and Stoner's motions to dismiss. First, the Complaint alleges Stoner "knew of the [P]laintiffs' privacy concerns and desire for seclusion at [Lot 29] and insistence on avoidance of publicity regarding their ownership and use of [Lot 29]." Compl. ¶ 13, at 4. In keeping with Plaintiffs' desire for privacy, the Sales Agreement recites Plaintiffs' "celebrity status" and requires the parties to the agreement to maintain confidentiality regarding the terms of the transaction. Sales Agreement ¶ 19.0 (attached as Exhibit A to the Compl.).[27] The

---

**26.** In fact, Mather's reference to the terms of the Sales Agreement in support of his argument that Plaintiffs' claim should be dismissed misconceives the analytical basis of implied covenants. By definition an implied or constructive condition does not arise from the express terms of a contract, but from "grounds of justice that are independent of expressed intention." 3A *Corbin on Contracts* § 632, at 22–23 (1960).

**27.** Consistent with this expressed desire for privacy, Plaintiffs conducted the negotiations for the purchase of Lot 29 through Morgan, a fact the existence of which Plaintiffs allege Stoner was aware. *See* Compl. ¶ 12, at 4.

Complaint contains repeated allegations that Mather and Stoner frustrated Plaintiffs' expectation of privacy by failing to disclose Deer Valley's plans to construct the ski trail, *see* Compl. ¶¶ 19, 21, 25, 29, 30, 33, 35, 37, at 5–10, and that had Mather or Stoner disclosed this information Plaintiffs would have terminated negotiations for Lot 29 or insisted on a lower purchase price. *Id.* ¶ 20, at 5.[28] These allegations are sufficient at this stage of the proceedings to state a claim for breach of the covenant of good faith and fair dealing.[29]

### G. Claim for Detrimental Reliance and Unjust Enrichment

 Mather and Stoner have moved to dismiss Plaintiffs' seventh claim for relief for detrimental reliance and unjust enrichment. Mather bases his motion on the statement that Plaintiffs "make no allegation as to how the existence of the ski path has affected their full use and benefit of the property or caused them to suffer damage."[30] This statement is incorrect. The Complaint plainly alleges that Mather's misrepresentations, and promises benefitted him by forcing Plaintiffs to pay an inflated price for Lot 29. Compl. ¶ 67, at 16. Moreover, the Complaint contains at least eight separate allegations that Mather's actions have frustrated Plaintiffs' use of Lot 29 and that Mather was aware of this intended use before Plaintiffs purchased the property. *See id.* ¶¶ 19, 21, 25, 29, 30, 33, 35, 37, at 5–10.

Stoner claims Plaintiffs have failed to include "statements which explain the 'promises' made to [P]laintiffs and [have included] no explanation as to how [P]laintiffs arrive at the conclusion that they paid an 'inflated purchase price' for the property or how they have been deprived of the 'full use and benefit of the property.'" Stoner Mem. at 10. As with Mather's arguments discussed above, these arguments are incorrect. Plaintiffs'

Complaint describes Stoner's alleged misrepresentations, states that these misstatements resulted in Plaintiffs paying an inflated purchase price for Lot 29, and repeatedly alleges that Stoner's misstatements have resulted in Plaintiffs being denied their intended use of Lot 29. Compl. ¶¶ 19, 21, 25, 29, 30, 33, 35, 37, 67–68, at 5–10, 16.

### H. Claim for Misrepresentation

Finally, Mather has moved to dismiss Plaintiffs' eighth claim for relief for misrepresentation. In so moving, however, Mather relies on the same arguments as those asserted in support of his motion to dismiss Plaintiffs' first claim for relief for reckless misrepresentation. The court already has rejected these arguments elsewhere in this opinion, and therefore denies Mather's motion to dismiss Plaintiffs' eighth claim for relief.

## IV. ORDER

For the foregoing reasons, and good cause appearing,

IT IS HEREBY ORDERED as follows:

1. Plaintiffs' First Claim for Relief for Fraud is dismissed as against Mather.

2. Plaintiffs' Fifth Claim for Relief for violation of the CSPA is dismissed as against Mather.

3. Mather's and Stoner's motions to dismiss are denied in all other respects.

4. Plaintiffs are ordered to file and serve unredacted versions of their Complaint and associated exhibits within twenty days of the date of this order.

5. This order will suffice as the court's ruling and counsel need prepare no further order.

---

**28.** Given this claim, Mather's argument that Plaintiffs' claim is defective because it fails to allege a "decrease in the actual value" of Lot 29 is without merit.

**29.** The Price Letter is of no avail to Mather regarding Plaintiffs' claim for breach of the covenant of good faith because of Plaintiffs' allegation that Mather misrepresented his knowledge of the

ski trail in the Disclosure Statement. Compl. ¶ 29, at 8.

**30.** Mather also relies on the Stoner Letter in support of his motion to dismiss Plaintiffs' seventh claim for relief. As previously explained, this letter is of no avail to Mather at this stage of the proceedings.