Stanley B. and Jody J. SECOR, et al., Plaintiffs and Respondents,

v.

Jesse KNIGHT and Michele Knight, Defendants, Third-Party Plaintiffs and Appellants,

v.

Leon PETERSON and Karen F. Peterson, and Guardian Title Company, a Utah corporation, Third-Party Defendants and Respondents.

No. 18665.

Supreme Court of Utah.

March 3, 1986.

---

1. U.C.A., 1953, § 35–4–10(i); *Martinez v. Bd. of Review,* 25 Utah 2d 131, 477 P.2d 587 (1970); *Whitney v. Bd. of Review,* Utah, 585 P.2d 780 (1978).

Brandt Wall, Salt Lake City, for defendants, third-party plaintiffs and appellants.

Theodore F. Kanell, Salt Lake City, for Secor.

Steven H. Stewart, Richard K. Hincks, Salt Lake City, for Peterson.

Gretta C. Spendlove, Salt Lake City, for Guardian Title Co.

DURHAM, Justice:

Defendants Jesse and Michele Knight appeal from an order which enjoined the operation of a basement rental apartment in the Knights' home. Plaintiffs, who are residents of the subdivision, brought the action for injunction on the ground that defendants were violating a restrictive covenant limiting buildings in the subdivision to single-family dwellings. Plaintiffs alleged that defendants' lot was subject to that restriction. Defendants answered and filed third-party complaints against the developers of the subdivision, alleging fraud, and against the title company which handled the closing on the sale of the lot, alleging breach of fiduciary duty. The trial court entered judgment for plaintiffs, enjoining defendants from further operation of any apartment in their home. The court also ordered judgment in favor of the developers on the basis of no cause of action and dismissed with prejudice the complaint against the title company. We affirm.

In 1978, the Knights purchased a lot in the Manor Estates subdivision from the Petersons, the developers of the project. Before purchasing the lot, the Knights met with a sales agent for the subdivision, David Goates, and discussed their interest in purchasing a lot. In that discussion, the Knights specifically indicated their desire and intent to build a house with a basement apartment. Friends of the Knights, Mr. and Mrs. Erickson, were also present at that meeting and expressed the same interest. Both couples ultimately bought lots in the subdivision.

The evidence, which is conflicting, appears to indicate that at the meeting between the Knights, the Ericksons, and Mr. Goates on April 3, 1978, Mr. Goates stated that the developer wanted homes with 1,500 square feet and attached garages. Goates further stated that the developer had originally considered multiple units such as apartments and condominiums as a possible use in the subdivision, but that it had been decided that duplexes would not be allowed. The evidence also indicates, however, that the exact nature of the restrictions to imposed was unclear and that Mr. Goates implied that there would be no problem with having a separate apartment in the basement. Further, he told the Knights and their friends that he was aware of situations in which people in other

subdivisions had built basement apartments, despite restrictions prohibiting them, and that there were no problems because the neighbors took no action. At trial, Mr. Goates testified that he had specifically told defendants that if they built an apartment to be used for nonfamily members, defendants would do so at their own risk. The trial court ultimately determined that as a result of this conversation the Knights were on notice that duplexes would not be allowed, although the court also found that the statements made by the agent were misleading and were made in order to accomplish the sale.

At the conclusion of the meeting with Mr. Goates, the Knights decided to buy a lot and entered into an earnest money agreement on April 3, 1978. The earnest money agreement made no reference to restrictive covenants, although it did contain a statement which provided "that execution of the final contract shall abrogate this Earnest Money Receipt and Offer to Purchase."

At the time the earnest money agreement was signed, the area was zoned for multiple units, and neither the subdivision plat nor the restrictive covenants had been recorded. More than two months later, on June 10, 1978, the subdivision plat was recorded, and on June 20, 1978, the restrictive covenants were recorded whereby land use in Manor Estates was restricted to single-family dwellings. The Knights were not notified of these actions. On June 27, 1978, the Knights attended a closing at the offices of third-party defendant Guardian Title Company. There was no discussion regarding restrictive covenants at that time. Although there was some testimony that the Knights did not see or read the deed at the closing and that they did not receive a copy of the restrictive covenants, the trial court found, based on other testimony, that at the closing the Knights received a warranty deed which referred to "restrictions of record." The deed was recorded on July 5, 1978.

Subsequently, the Knights obtained financing and a building permit for a home.

They later obtained a building permit for the basement apartment, apparently after the construction of the apartment. During this period, the Knights never inquired into the existence of any restrictions on the use of their land. The Knights began rental of the apartment in the summer of 1980. In October 1980, plaintiffs filed this suit asking for an injunction against further violation of the restrictive covenants by operation of the basement apartment.

The primary issue before this Court is whether, under the circumstances of this case, the restrictive covenant limiting use to a single-family dwelling is enforceable as to the Knights. For the reasons stated below, we hold that it is.

In their appeal, the Knights claim that based on the earnest money agreement they had acquired a vested equitable interest in the property and that any modification in that interest, *i.e.*, the imposition of restrictive covenants, required their express consent. In opposing the Knights' claim, the Secors, plaintiffs below, and the Petersons, third-party defendants, assert the doctrine of merger, which this Court recognizes. *See, e.g., Espinoza v. Safeco Title Insurance Co.*, Utah, 598 P.2d 346 (1979). They correctly state the general rule, which is that on delivery and acceptance of a deed the provisions of the underlying contract for the conveyance are deemed extinguished or superseded by the deed. *Stubbs v. Hemmert*, Utah, 567 P.2d 168, 169 (1977); 3 Corbin, *Contracts* § 604, at 627 (1960); Annot., 38 A.L.R.2d 1310, 1312–13 (1954); Annot., 84 A.L.R. 1008, 1009 (1933). The basis for imposing the doctrine of merger is "not due to any peculiar sanctity attaching to the deed itself, but because it is regarded as the final repository of the agreement which led to its execution." 84 A.L.R. at 1009.

The defense of so severe a rule [merger] must rest on the ground that in conveyances of land, the parties habitually put their full agreement in the deed, at least with reference to title and that if it is intended that the vendor shall be re-

sponsible for defective title, a warranty is inserted.

S. Williston, *Contracts* § 926, at 783 (3d ed.1961) (footnote omitted). There are, however, certain exceptions to this doctrine, including fraud, mistake, and the existence of collateral rights in the contract of sale. Annot., 38 A.L.R.2d at 1315. In cases relating to collateral terms, courts generally find that the execution and delivery of a deed is not the intended performance of those specific terms and that therefore the terms are not extinguished by acceptance of the deed. For example, in *Stubbs v. Hemmert,* this Court found that the terms in the underlying contract relating to the removal of air compressors from a piece of property were collateral to the agreement to convey the property and were therefore not extinguished by the deed. 567 P.2d at 170. *See also Kelsey v. Hansen,* 18 Utah 2d 226, 419 P.2d 198 (1966) (recognizing the existence of cases in equity which result in nonmerger, but declining to apply nonmerger under the facts of that case). In this regard, covenants relating to title and encumbrances are not considered to be collateral because they relate to the same subject matter as does the deed. *See* Annot., 84 A.L.R. at 1009, 1017.

■ In arguing against the application of the merger doctrine in this case, the Knights claim that the intent of the parties must be examined. The Knights further assert that the evidence clearly indicates that merger would be inconsistent with their intent. While the latter assertion may be correct, the Knights misconstrue the significance of intent as it generally relates to merger. Although intent may be an issue where a specific term in the original contract of sale is omitted in the deed, *see* Annot., 38 A.L.R.2d at 1313, the intent issue arises primarily in cases focusing on terms which involve a different subject matter or are collateral to the conveyance, *see id.* In such cases the question of whether a specific term is or is not collateral, and hence whether the term will or will not merge into the deed, is determined by the intent of the parties. The Utah cases cited by the Knights in support of

their intent argument all involve the issue of collateral terms. *Baxter v. Stubbs,* Utah, 620 P.2d 68 (1980); *Bowen v. Olsen,* Utah, 576 P.2d 862 (1978); *Stubbs v. Hemmert,* Utah, 567 P.2d 168 (1977). In *Stubbs v. Hemmert,* this Court explained the operation of the merger doctrine and the significance of the intent of the parties in cases involving the collateral terms exception:

> The doctrine of merger, which this Court recognizes, is applicable when the acts to be performed by the seller in a contract relate only to the delivery of title to the buyer. Execution and delivery of a deed by the seller then usually constitute full performance on his part, and acceptance of the deed by the buyer manifests his acceptance of that performance even though the estate conveyed may differ from that promised in the antecedent agreement. Therefore, in such a case, the deed is the final agreement and all prior terms, whether written or verbal, are extinguished and unenforceable.
>
> However, if the original contract calls for performance by the seller of some act collateral to conveyance of title, his obligations with respect thereto survive the deed and are not extinguished by it. Whether the terms of the contract are collateral, or are part of the obligation to convey and therefore unenforceable after delivery of the deed, depends to a great extent on the intent of the parties with respect thereto.

567 P.2d at 169 (footnotes omitted). As this case involves terms relating to title, which are not collateral, the Knights' reliance on intent is misplaced.

■ The Knights also seek relief based on allegations of fraud on the part of the Petersons. In reviewing the record we note the following: (1) the Knights explicitly communicated their desire to build a basement apartment for rental purposes; (2) in response, the Petersons' agent made some misleading statements regarding the building restrictions and potential problems associated with operating a rental apart-

ment; (3) the earnest money agreement, which culminated the discussion between the Knights and the agent, made no reference to restrictive covenants; (4) the restrictive covenants were later drawn up and recorded by the sellers just prior to closing; (5) at closing there was no mention of the restrictions; and (6) there is no evidence to indicate that the Knights received a copy of the restrictions, although they did receive a deed which referred to "restrictions of record." These facts present a reasonable argument for the possible conclusion that there was fraud on the part of the sellers, and admittedly this is not a clear cut case. However, in order to prevail on a claim of fraud, all the elements of fraud must be established by clear and convincing evidence. *Cheever v. Schramm*, Utah, 577 P.2d 951, 954 (1978). Those elements are:

> (1) a representation; (2) concerning a presently existing material fact; (3) which was false; (4) which the representer either (a) knew to be false, or (b) made recklessly, knowing that he had insufficient knowledge on which to base such representation; (5) for the purpose of inducing the other party to act upon it; (6) that the other party, acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his injury and damage.

*Dugan v. Jones*, Utah, 615 P.2d 1239, 1246 (1980) (footnote omitted). Despite conflicting evidence, the trial court specifically found that the Knights were on notice that duplexes would not be permitted and, further, that the Knights failed to reasonably rely on the statements of the real estate agent. Those findings negate the existence of elements six and seven listed above.

In reviewing an equity case such as this, it is our prerogative "to weigh the facts as well as to review the law." *Jensen v. Brown*, Utah, 639 P.2d 150, 151 (1981). However, "where the evidence is in conflict this Court will not upset the findings in the trial court unless the evidence so clearly preponderates against them that this Court is convinced that a manifest injustice has been done." *Horton v. Horton*, Utah, 695 P.2d 102, 105 (1984). The record reveals, among other things, that the testimony as to what the real estate agent told the Knights is uncertain and contradictory. Thus, we cannot say that the evidence so clearly preponderates against the trial court's findings that a manifest injustice has occurred. We must therefore uphold the court's findings and conclude that the Knights failed to establish all the requisite elements of fraud. In the absence of fraud, the merger doctrine applies, and we hold that the restrictive covenants are enforceable against the Knights.

In reaching this holding, however, we do not condone the manner in which this transaction was conducted by the developers/sellers, the Petersons, and their agent, Mr. Goates. Although the trial court found that as a result of the conversation with Mr. Goates, the Knights were on notice that duplexes would not be permitted, it is our opinion that under these circumstances it would have been proper to give the Knights explicit notice of the imposition of the restrictive covenants. *See Jones v. Garden Park Homes Corp.*, Mo., 393 S.W.2d 501, 505 (1965). On execution of the earnest money agreement, the parties entered into a binding contract, *Cahoon v. Cahoon*, Utah, 641 P.2d 140, 143 (1982); *Bunnell v. Bills*, 13 Utah 2d 83, 87, 368 P.2d 597, 600–01 (1962); *see also Century 21 All Western Real Estate v. Webb*, Utah, 645 P.2d 52, 55 (1982), and pursuant to that contract both parties acquired rights and duties. On that basis, the developers should have notified the Knights on or prior to delivery of the deed. The failure to so notify the Knights cannot change the result in this case because of the operation of the merger doctrine, an admittedly harsh rule of law, but in our view such action on the part of the developers would have prevented the dispute and would therefore have averted this litigation.

Furthermore, we believe it appropriate to censure the developers on other grounds as well, although the application of the merger doctrine in this case is likewise not af-

fected by the following observations. The major justification for adherence to the merger doctrine is that upholding merger, in all but the exceptional cases involving fraud, mistake or collateral terms, preserves the integrity of the final document of conveyance and encourages the diligence of the parties. That diligence involves a duty on the part of both parties to make certain that their agreements have in fact been fully included in the final document. In this regard, the Knights may have been less than diligent in failing to protect their rights by reading their deed and inquiring about its provisions. Such lack of diligence on the part of the Knights had the effect of exposing them to the harsh result we reach today. However, the lack of diligence does not negate the fact that both Mr. Peterson, a licensed real estate broker, and Mr. Goates, a licensed real estate sales agent, had a duty to conduct the sales transaction honestly and fairly.

Under Utah law, the general rule is no fiduciary obligations exist between a buyer and seller of any property. A real estate agent, however, does not occupy the position of a lay vendor of property. An agent is licensed by the state and is required to meet standards of "honesty, integrity, truthfulness, reputation, and competency." A real estate license may be revoked if the licensee is unable or unworthy to safeguard the interests of the public.

. . . .

In this state, it is apparent that the rule of caveat emptor does not apply to those dealing with a licensed real estate agent. Though not occupying a fiduciary relationship with prospective purchasers, a real estate agent hired by the vendor is expected to be honest, ethical, and competent and is answerable at law for breaches of his or her statutory duty to the public.

*Dugan v. Jones*, Utah, 615 P.2d 1239, 1248 (1980) (footnotes omitted). By obfuscating the nature of the restriction to be imposed, by unilaterally inserting the reference in the deed to restrictions of record which had only been recorded a few days before closing, and then by failing in any way to point out the modification inserted in the deed, the sellers' actions were seriously deficient in relation to the duty owed to the public in general and to the Knights in particular. In our view, the entire course of dealing in this transaction was substandard.[1]

Notwithstanding the deficiencies in the sellers' course of dealing, the Knights

---

1. We further note in passing, as the issue was not raised by the parties in this matter, that Utah has adopted legislation which deals with sales of subdivided lands. U.C.A., 1953, §§ 57–11–1 to –21 (1974 and Supp.1985). Under the provisions of that legislation, the purchaser is entitled to a summary of all encumbrances and restrictions affecting the land in question, *id.* at § 57–11–7(1)(c) (1974), prior to signing a contract, *id.* at § 57–11–5(3) (Supp.1985). The intent of the legislation is to prevent "fraud and sharp practices in a type of real estate transaction peculiarly open to such abuses." *Wallis v. Thomas*, Utah, 632 P.2d 39, 41 (1981). Although those statutes do not determine the outcome of this case, they indicate the public policy of holding sellers of subdivided lands to a high standard of fair dealing.

Similarly, other states have, on the basis of public policy, imposed upon real estate brokers the duty to deal fairly and honestly, despite the fact that the broker is acting primarily as the seller's agent. *See* Note, *Real Estate Brokers' Duties to Prospective Purchasers,* 1976 B.Y.U.L. Rev. 513, 514–15. We also note with approval cases from California which focus on the status and responsibilities of real estate brokers, particularly in the area of disclosure of information. Failure to communicate accurate or complete information has been grounds for relief based on fraud, *Cooper v. Jevne,* 56 Cal.App.3d 756, 128 Cal.Rptr. 724 (1976); *Brady v. Carman,* 179 Cal.App.2d 63, 3 Cal.Rptr. 612 (1960), and on negligence, *Easton v. Strassburger,* 152 Cal. App.3d 90, 199 Cal.Rptr. 383 (1984). In *Easton,* the court stated that the underlying purposes for imposing a duty to disclose "are to protect the buyer from the unethical broker and seller and to insure that the buyer is provided sufficient accurate information to make an informed decision whether to purchase." *Id.* at 99, 199 Cal. Rptr. at 388. Further, the court noted that misplaced reliance on the broker can result in substantial injury to the buyer. *Id.* at 100–01, 199 Cal.Rptr. 388–89. Thus, in *Easton,* the court upheld the following instruction:

"A real estate broker is a licensed person or entity who holds himself out to the public as having particular skills and knowledge in the real estate field. He is under a duty to disclose facts materially affecting the value or desirability of the property that are known to him or which through reasonable diligence should be known to him."

*Id.* at 98, 199 Cal.Rptr. at 387.

failed to establish fraud in this case, and in the absence of fraud the merger doctrine applies. Therefore we affirm the judgment of no cause of action against the Petersons, and we uphold the injunction ordered by the trial court.

Finally, the Knights have appealed from the dismissal of the breach of fiduciary duty action against Guardian Title. The trial court found no fiduciary relationship existed between the Knights and Guardian, and our review of the record indicates ample evidentiary support for that finding. We therefore also affirm the dismissal of the action against Guardian Title Company.

HALL, C.J., and STEWART, HOWE and ZIMMERMAN, JJ., concur.