Spenst M. HANSEN, a Washington resident, Plaintiff,

v.

STICHTING MAYFLOWER RECREATIONAL FONDS and Stichting Mayflower Mountain Fonds, each a Netherlands Association, Defendants.

Civ. No. 93–C–1059W.

United States District Court,
D. Utah,
Central Division.

July 3, 1995.

Thomas W. Bachtell, John F. Waldo, Jr., Pruitt, Gushee & Bachtell, Salt Lake City, UT, for plaintiff.

Bruce A. Maak, Mark A. Wagner, Kimball, Parr, Waddoups, Brown & Gee, Salt Lake City, UT, for defendants.

## MEMORANDUM DECISION AND ORDER DENYING CROSS–MOTIONS FOR SUMMARY JUDGMENT

WINDER, Chief Judge.

This matter is before the court on two motions for summary judgment: (1) plaintiff

Spenst M. Hansen's ("Plaintiff" or "Hansen") motion seeking a declaration quieting title in the surface rights to a contested tract of land, and (2) defendants Stichting Mayflower Recreational Fonds' and Stichting Mayflower Mountain Fonds' ("Stichting" or "Defendants") motion seeking title to the surface rights in the same tract. A hearing on these motions was held May 23, 1995. John F. Waldo represented Plaintiff. Bruce A. Maak and Mark A. Wagner represented Defendants. Before the hearing, the court considered carefully the memoranda and other materials submitted by the parties. Since taking the matter under advisement, the court has further considered the law and facts relating to the two motions. Now being fully advised, the court enters the following memorandum decision and order.

## I. BACKGROUND

The action on which the instant cross-motions are based is one to quiet title in an 8.884 acre tract of land located in Wasatch County, Utah. This tract, a portion of the Homestake No. 3 mining claim, will be referred to as the "Homestake Portion." For the most part, the facts underlying the motions are undisputed. The same cannot be said, however, for the inferences to be drawn therefrom.

### A. Pre–1973 History of Homestake Portion

In June of 1906, the United States of America issued to Homestake Mining Company ("Homestake Mining") letters patent for a mining claim known as Homestake No. 3, which was designated as Lot No. 5028. Approximately six months later, Harwood Mining Company ("Harwood") was issued letters patent for Horn Silver No. 1 and Horn Silver No. 2 mining claims. Although the exterior metes and bounds of the Horn Silver claims embrace most of the Homestake Portion, the patent for the Horn Silver claims excludes all of the land within the Homestake No. 3 claim.

In November of 1928, Homestake Mining issued a quitclaim deed to East Utah Mining Company ("East Utah"), Harwood's successor in interest. That deed stated that when Homestake Mining originally applied for a patent to Homestake No. 3, Harwood had objected, asserting superior rights under the overlapping Horn Silver claims. To settle that dispute, Homestake Mining agreed to convey to Harwood a portion of Homestake No. 3. Accordingly, Homestake Mining's deed quitclaimed the following portion of Homestake No. 3 to East Utah:

> Beginning at the Northeast corner No. 4 of the Homestake No. 3 lode, Survey No. 5028, and running thence South 81*00′ West 602.8 feet to northwest corner No. 3 of said Homestake # 3 lode; thence South 14*30′ East 289.8 feet to point of intersection of west side line of said Homestake No. 3 lode with the east end line of Belcher No. 5 lode, Lot 195; thence south 22*30′ East 9.3 feet to southeast corner No. 4 of said Belcher No. 5 lode; thence North 81*East 40 feet to northeast corner No. 3 of Belcher No. 4 lode, Lot No. 194; thence south 16*04′East 182.9 feet to a point of intersection on the south side line of the Horn Silver Mining Claim no. 1 lode, survey No. 5070 and north side line of the Horn Silver Mining Claim no. 2 lode, Survey No. 5070 with the east end line of said Belcher No. 4 lode; thence south 66*15′ East 705.4 feet to a point of intersection of the south side line of the said Horn Silver Mining Claim No. 2 lode, with the east side line of said Homestake No. 3 lode; thence North 14*30′ West along east side line of said Homestake No. 3 lode, 864.7 feet to northeast corner No. 4 of said Homestake No. 3 lode, the place of beginning, containing 8.884 acres.

This distinctively-described portion of Homestake No. 3 is the subject Homestake Portion.

In 1929, Homestake Mining conveyed to Edgar A. Bering ("Bering") certain mining claims, including "Home Stake No. 3 Lode U.S. Survey No. 5028, expressly excluding therefrom the following described property . . . ." The "excluded" property was the Homestake Portion. Bering, in turn, conveyed various properties to Park City Utah Mines Company ("Park City Company"), including:

Homestake No. 3 Mining Claim U.S. Lot No. 5028 expressly excluding therefrom that portion of the said Homestake No. 3 Mining Claim dated (sic.) to the East Utah Mining Company under date of November 9, 1928, and recorded in Book 10 of Mining Deeds, page 152 of Wasatch County, Utah.

Thus, by 1929, the land contained in the original Homestake No. 3 patent had been divided into two separate and distinct parcels: (1) the Homestake Portion, owned by East Utah, and (2) the rest of Homestake No. 3, owned by Park City Company. At this point, then, East Utah owned surface and mineral estates in Horn Silver Nos. 1 and 2, as well as in the Homestake Portion. Although both Horn Silver No. 1 and Horn Silver No. 2 were patented, the Homestake Portion was technically patented as part of Homestake No. 3.

### B. Lon—East Utah Transactions

On August 1, 1973, East Utah entered into both an Agreement ("1973 Agreement") and a Uniform Real Estate Contract (collectively "Lon Agreement") with Lon Investment Company ("Lon"). In the Uniform Real Estate Contract, East Utah agreed to sell and Lon agreed to purchase certain property. *See* Uniform Real Estate Contract (Aug. 1, 1973). Schedule "A" of the Uniform Real Estate Contract stated that East Utah intended to convey surface rights only in several patented and unpatented mining claims:

> [patented mining claims] Mountaineer, Mountaineer No. 1, Mountaineer No. 2, Mountaineer No. 3, Neptune, Leone, Horn Silver, Horn Silver No. 1, Horn Silver No. 2, Lost Boulder No. 1, Lost Boulder No. 2, Lost Boulder No. 3, Lost Boulder No. 4, Lost Boulder No. 5, Lincoln, Norris, Silver Coin, Silver Coin No. 1, Sussie C, Evans, Evans No. 1, Minnie, Deseret Entry, *and any other rights of Seller in any patented mining claims adjoining or contiguous to the foregoing claims.*
>
> And the surface rights in the Norma, Dos, Uno and Tres unpatented mining claims.

*See id.* at Schedule "A" (emphasis added). It is undisputed that the Homestake Portion shares at least one common border with one of the patented mining claims named in this description. Stichting therefore contends that the language "and any other rights of Seller in any patented mining claims adjoining or contiguous to the foregoing claims" ("mother hubbard clause"), describes the Homestake Portion.

In addition, the Uniform Real Estate Contract stated that:

> [t]he Seller on receiving the payments herein reserved to be paid at the time and in the manner above mentioned agrees to execute and deliver to the Buyer or assigns, a good and sufficient *warranty deed* conveying the title to the above described premises....

*See id.* at ¶ 19 (emphasis added). The Uniform Real Estate Contract also gave Lon the right:

> prior to the payment of the entire balance hereunder, upon payment of the sum of ONE THOUSAND FIVE HUNDRED DOLLARS ($1,500.00) per acre or multiples thereof, to have conveyed to it such part of the property as Buyer shall select for use by it in development. Selections by Buyer shall be in a contiguous tract on the outside boundaries of the property so as to leave the remainder of the property in a contiguous tract....

*Id.* at ¶ 23.

In the concurrently executed 1973 Agreement, East Utah and Lon first acknowledged entering into a Uniform Real Estate Contract. *See* Agreement (Aug. 1, 1973) [hereinafter "1973 Agreement"]. The 1973 Agreement then stated its purpose:

> The purpose of this Agreement is to confirm the understanding between East Utah and Lon whereby East Utah will be entitled to a *participating interest over and above the consideration provided for in Exhibit "A"*[1] *in the total project* as hereinafter defined on the terms and conditions herein stated.[2]

---

1. The court has not been provided with a copy of Exhibit "A." The lands which East Utah contracted to sell are described in Schedule "A."

2. East Utah's share of net profit was to be 10% of total net profit. *See* 1973 Agreement at p. 2.

*See id.* at p. 1 (emphasis added). "Total project" was defined as:

> the sum total of fee lands owned by Lon located between Keetley on the East and the center line of Sections 29 and 32, Township 2 South, Range 4 East, Salt Lake Base and Meridian, on the West, and the lands described in Exhibit "A". . . .

*Id.* at p. 2.

The 1973 Agreement further stated that:

> It is agreed that Lon is seeking to acquire rights with respect to other property adjoining the Lon property on the North including property from Park City, Utah Mines Company and San Diego Mining Company. It is agreed that should Lon be successful in acquiring any such rights, Lon will have and possess the surface rights with respect thereto. Lon will extend to East Utah the first right to acquire the mineral rights, if any, that may be acquired with respect thereto. Provided, however, it is understood that there is no assurance of [sic.] either the surface or the mineral rights might be acquired with respect to said property.

*Id.* at p. 3.

In April of 1977, Lon and East Utah modified the payment terms outlined in the Lon Agreement because Lon had "been unable to make the payments required under the [prior] terms." *See* Addendum to Agreement at p. 1 (Apr. 12, 1977).

### C. Post–1973 Assignments of Lon Agreement

On August 17, 1977, Lon assigned and quitclaimed its right, title, and interest in the Lon Agreement to Ross Lare Realty ("Ross Lare"). *See* Assignment and Quitclaim of Installment Land Contract Interest (Aug. 17, 1977) [hereinafter "Lon–Ross Lare Agreement"]. The relevant document states that:

> This Assignment and Quitclaim is made subject to all liens, encumbrances and exceptions to title of record as of the date hereof, and while it is intended hereby to convey all appurtenances to the real property described in Exhibit A attached hereto, . . . the undersigned makes no warranty whatsoever of seisen, possession, right to convey, encumbrances, title or indemnity with respect to said rights.

*Id.* Exhibit "A" to the Lon–Ross Lare Agreement named and quitclaimed all of the claims named in Schedule "A" of the Uniform Real Estate Contract except Horn Silver, Uno, Dos, Tres, and Norma. Exhibit "A" also quitclaimed, by metes and bounds descriptions, both Deseret Entry[3] and the Homestake Portion.

Eventually, all interests of Ross Lare were conveyed to Stichting, which leased those interests to Deer Valley Resort Company on January 29, 1982. In the lease to Deer Valley Resort Company, Stichting indicated that "claims adverse to Lessor's title to the East Utah Property are pending and may be filed," and declined to make "representations or warranties of title to or quiet possession of the East Utah Property, express or implied." *See* Lease, art. III(B) (Jan. 29, 1982).

### D. Issuance of Later Documents re Lon Agreement

Beginning on January 23, 1976, as permitted by the Uniform Real Estate Contract, East Utah began to deed to Lon the property named in Schedule "A" of the Uniform Real Estate Contract. On that date, East Utah conveyed the surface rights to Deseret Entry[4] by warranty deed. *See* 1976 Special Warranty Deed.

---

3. Exhibit "A" to the Lon–Ross Lare Agreement included the following metes and bounds description:

> Beginning at a point 437.8 feet North from the Southwest corner of the Southeast quarter of Section 24, in Township 2 South of Range 4 East of the Salt Lake Meridian; and running thence North 63*30' East 721.1 feet; thence North 10*11' West 1667.1 feet; thence South 63*30' West 391.9 feet; thence South 1787.6 feet to the point of beginning.

This description was also used to define the property conveyed in the January 23, 1976 Special Warranty Deed, which further stated that

this particular parcel contained "20.44 acres, m/l." *See* Special Warranty Deed (Jan. 23, 1976) [hereinafter "1976 Special Warranty Deed"]. According to tax records submitted by the parties, the Deseret Entry claim contains 20.44 acres. The court assumes that the above metes and bounds description is of Deseret Entry.

4. Although Deseret Entry is not named, the metes and bounds description given parallels that described in the Lon–Ross Lare Agreement. Presumably, it is the Deseret Entry claim. *See supra* note 3 and accompanying text.

Over six years later, on October 8, 1982, Intramerican Oil & Minerals, Inc. ("Intramerican")—formerly known as East Utah—issued two deeds to Stichting, thereby conveying:

(1) surface rights in the Uno, Dos, Tres, and Norma unpatented mining claims. *See* Deed (Oct. 8, 1982) (recorded Oct. 20, 1982 at 8:52) [hereinafter "1982 Deed"].
(2) surface rights in the following patented mining claims:

"Evans, Evans No. 1 (MS 6732); Horn Silver Nos. 1 & 2 (MS 5070); Leone (MS 175; Lot 211); Lincoln (MS 3278); Lost Boulder Nos. 1 thru 5 (MS 5070); Minnie (MS 6732); Mountaineer, Mountaineer Nos. 1 thru 3 (MS 175; Lot 211); Neptune (MS 175, Lot 211); Norris (MS 101); Silver Coin, Silver Coin No. 1 (MS 6743); and Susie C. (MS 6732)." *See* Special Warranty Deed (October 8, 1982) (recorded Oct. 20, 1982 at 8:51) [hereinafter "1982 Special Warranty Deed"].

Through these three deeds—the 1976 Special Warranty Deed, the 1982 Deed, and the 1982 Special Warranty Deed—Intramerican/East Utah had conveyed surface rights in twenty-six of the twenty-seven claims actually named in the Uniform Real Estate Contract.[5] None of the three deeds, however, included a metes and bounds description of the Homestake Portion, the mother hubbard language, or mentioned the participating interest.

One further document was executed by Intramerican and Stichting. On October 11, 1982, these parties signed a Release of Participating Interest. *See* Release of Participating Interest (Oct. 11, 1982) (recorded Oct. 20, 1982 at 8:53) [hereinafter "RPI"]. Omitting recording information, this document stated:

Whereas, by a Uniform Real Estate Contract and an Agreement, both dated August 1, 1973 ... East Utah Mining Company (East Utah) agreed to sell and LON Investment Company (LON) agreed to buy the property described in Exhibit "A" attached hereto and incorporated herein by reference, and LON agreed to

pay East Utah a "participating interest" from profits of the sale or development of certain property; and

Whereas, by an Addendum to Agreement dated April 12, 1977 ... the payment terms of said Agreement were modified; and

WHEREAS, by an Assignment and Quitclaim of Installment Land Contract Interest dated August 17, 1977 ... LON conveyed its interest in said Uniform Real Estate Contract to Rosslare Realty, N.V. (Rosslare); and

Whereas, by an Assignment dated December 31, 1977 ... Rosslare assigned its interest in said Uniform Real Estate Contract to [Stichting], and

Whereas, by that certain Assignment and Quitclaim of Joint Venture Interest dated November 24, 1978 ... and that certain Quitclaim Deed dated June 1, 1981 ... Stichting Mountain Fonds has acquired the interest of Mayflower Recreational Fund in said Uniform Real Estate Contract; and

Whereas, all sums due under said Uniform Real Estate Contract and Agreement have been fully paid, including said participating interest, and all obligations, liens and encumbrances against the property described in Exhibit "A" hereto arising as a result of said Uniform Real Estate Contract and Agreement have been fully satisfied and discharged;

Now therefore, in consideration of the foregoing, Intramerican Oil & Minerals Inc., formerly East Utah Mining Company hereby fully and forever releases and quitclaims unto [Stichting] all right, title and interest of [Intramerican] in and to the property described in Exhibit "A" hereto.

The property described in Exhibit "A" of the RPI tracks exactly the language in Schedule "A" of the Uniform Real Estate Contract.

### E. Escrow Instructions

Prior to the execution of the October 8 and October 11 documents, Cooperative Centrale Raiffeisen–Boerenleenbank B.A. and Sticht-

---

**5.** The Horn Silver claim was not conveyed. In fact, the only other document submitted to the court that mentions the Horn Silver claim is the

Release of Participating Interest, whose Exhibit "A" is a near-duplicate of Schedule "A" to the Uniform Real Estate Contract.

ing, parties of the first part, and Irving Financial Corporation ("Irving") and Murray First Thrift & Loan Co. ("MFT"), parties of the second part, issued escrow instructions regarding numerous properties.[6] *See* Escrow Instructions to Associated Title Company (Sept. 30, 1982) [hereinafter "Escrow Instructions"]. There were three purposes for the escrow:

> *to consummate* the financing of and the purchase by Stichtings of those certain Notes[7] ... dated August 17, 1977, in which Ross Lare Realty, N.V., is the obligor and LON Investment Company ("LON") and MFT are the respective obligees, in the respective face amounts of $3,523,888.00 ... and $1,094,965.00, secured by Amended Trust Deeds ... covering the property described in Exhibit "K" hereto ...; *to assure* that the title of parties of the second part in and to the Notes is free and clear of all assignments, pledges or attachments of any kind whatsoever and may be conveyed to Stichtings free and clear of any interest whatsoever of other persons; and *to assure* that, upon consummation of the purchase, the title of Stichtings to the Property is free and clear of all liens, attachments and impositions of any kind arising prior to or in connection with the Notes....

Escrow Instructions at ¶ 2 (emphasis added). The escrow instructions bound "the parties hereto and their respective heirs, legal representatives, successors and assigns." *Id.* at ¶ 14.

**6.** The escrow instructions were not confined to the East Utah properties, and also included a number of other properties. The descriptions of included properties—either by name or by metes and bounds descriptions—cover approximately eighteen pages in the escrow instructions.

**7.** It appears that East Utah properties may not have been the only properties involved in these "Notes." For example, properties termed the "Mayflower Properties" were also the subject of a conveyance from Lon to Ross Lare in August of 1977. *See Stichting Mayflower Recreational Fonds v. Newpark Resources, Inc.,* 917 F.2d 1239, 1243 (10th Cir.1990). Just as in the instant case, those properties were later conveyed to Stichting. *Id.*

**8.** Paragraph 4 is entitled "Agreement of Parties of the Second Part re Persons who Are Not Parties Hereto."

In order to consummate the transactions contemplated by the escrow, Irving and MFT agreed to cause several non-parties[8] "to deliver to Escrow, promptly after the execution of this Agreement," certain "fully executed documents." *See id.* at ¶¶ 4, 4.1. East Utah was one of the non-parties that Irving specifically agreed to "cause" to deliver documents—in this case, a Special Warranty Deed and a Release of Participating Interest. *Id.* at ¶ 4.1(b).

The escrow instructions were signed by representatives of the parties. They were also signed as "approved and accepted" by non-parties, including Intramerican.

The copy of Exhibit K of the escrow instructions which Defendants provided to the court mentions the Homestake Portion in two separate places:

> (1) "The following described lode mining claim: Homestake No. 3, Lot No. 5028, *excepting* the following part thereof: [followed by metes and bounds description of the Homestake Portion].[9] *See* Escrow Instructions at Parcel B–2 (emphasis added).

> (2) "That part of the Home Stake No. 3, Lot No. 5028, described as follows: [followed by metes and bounds description of Homestake Portion]." *See id.* at Parcel D–2.

### F. Post–1982 Intramerican– Related Conveyances

Approximately four years after execution of the 1982 Special Warranty Deed, Intram-

The "non-parties" were: (1) New Park Resources, Inc., (2) East Utah, (3) First Security Bank of Utah, (4) Citizens Bank & Trust Company, (5) Union Bank, (6) Kay M. Lewis, Trustee, (7) Park City Utah Mining Company, (8) San Diego Mining Company, and (9) FMA Thrift & Loan Company. *See* Escrow Instructions at ¶¶ 4.1, 4.2.

**9.** Park City Company had apparently executed a surface lease to Homestake No. 3 with Lon on January 1, 1974. *See* Title Policy at Schedule A (attached as Exhibit "L" to Memorandum in Opposition to Plaintiff Spenst Hansen's Second Motion for Summary Judgment (Mar. 31, 1995) [hereinafter "Stichting's Opposition Memo."]). This leasehold interest specifically excluded the Homestake Portion.

erican executed a Deed to Mining Claims in favor of Franco–Nevada Mining Corporation, Inc. ("Franco–Nevada"). *See* Deed to Mining Claims (Apr. 18, 1986). In that deed, Intramerican named nearly all[10] of the patented mining claims listed in Schedule "A" of the Uniform Real Estate Contract and "sold" its rights in those claims to Franco–Nevada. In addition, Intramerican conveyed its rights in Homestake No. 3, MS–5028.[11] The Deed to Mining Claims was also "made subject to the following":

(1) the Agreement between East Utah and Lon dated August 1, 1973, "covering the UNO, DOS, TRES, NORMA, EVANS, EVANS NO. 1, HORN SILVER NOS. 1 and 2, LOST BOULDER NOS. 1 through 5, MOUNTAINEER, MOUNTAINEER NOS. 1 through 3, SILVER COIN, SILVER COIN NO. 1, SUSSIE C., MINNIE, NORRIS, LINCOLN, DESERT ENTRY, LEONE and NEPTUNE mining claims,"[12]

(2) the January 23, 1976 Special Warranty Deed,

(3) the October 8, 1982 Special Warranty Deed,

(4) the October 8, 1982 Deed.

Intramerican did not specify that the Deed to Mining Claims was made "subject" to the RPI.

Approximately one year later, Franco–Nevada conveyed its "right, title and interest" in specified mining claims to Euro–Nevada Mining Corporation, Inc. ("Euro–Nevada"). *See* Mining Deed and Assignment of Leasehold (Sept. 30, 1987). Listed under the "Patented Mining Claims" being conveyed are both surface[13] and mineral rights to the Homestake Portion—"Homestake No. 3, MS 5028."[14]

Then, in 1992, Euro–Nevada executed a deed in favor of W. Dan Proctor ("Mr. Proctor"). *See* Mineral Deed with Reserved Rights (Feb. 1, 1992). This document quitclaimed, "without warranty," Euro–Nevada's "right, title, and interest" in the property described therein, and specifically listed the Homestake Portion, as described by metes and bounds. The Homestake Portion was included as part of "Fee Properties," which also included other Lon Agreement tracts. The initial portion of the Fee Properties section stated that:

The Fee Properties subject to this Indenture are all (i) minerals and mineral rights and (ii) all surface rights Grantor [Euro–Nevada] may have for mining and associated operations, if any, in, on or under [the listed mining claims]. . . .

Culminating this chain of conveyances, Mr. Proctor later conveyed his right in several patented mining claims, including the Homestake Portion—again described by metes and bounds—to Plaintiff Hansen. *See* Special Warranty Deed (Oct. 2, 1993) [hereinafter "Hansen Deed"].

## II.  *STANDARD OF REVIEW*

■ Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court must construe all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Wright v. Southwestern Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir.1991).

■ Once the moving party has carried its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by

---

**10.** Neither Horn Silver nor Deseret Entry is named.

**11.** No metes and bounds description was given.

**12.** The Deed to Mining Claims did not mention the Horn Silver claim which was listed in the Lon Agreement, nor did it include either a metes and bounds description of the Homestake Portion or the mother hubbard language.

**13.** This document lists all other tracts named in the Uniform Real Estate Contract, except Horn Silver and Deseret Entry, and conveys only mineral rights in those claims.

**14.** Again, no metes and bounds description was given.

... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Gonzales v. Millers Casualty Ins. Co.,* 923 F.2d 1417, 1419 (10th Cir.1991).[15] The nonmoving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. at 2552.

■ In considering whether there exist genuine issues of material fact, the court does not weigh the evidence but instead inquires whether a reasonable jury, faced with the evidence presented, could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Clifton v. Craig,* 924 F.2d 182, 183 (10th Cir.), *cert. denied,* 502 U.S. 827, 112 S.Ct. 97, 116 L.Ed.2d 68 (1991).[16] Finally, all material facts asserted by the moving party shall be deemed admitted unless specifically controverted by the opposing party. D.Utah R. 202(b)(4).

### III. *SUMMARY OF ARGUMENTS*

Both Plaintiff and Defendants now seek a declaration in their favor quieting title in the Homestake Portion. Hansen argues essentially that: (1) no deed explicitly transfers title to the Homestake Portion by name, metes and bounds description, or otherwise, (2) all prior agreements between the parties merged into the 1976 Special Warranty Deed, the 1982 Deed, and the 1982 Special Warranty Deed—none of which mentions the Homestake Portion, (3) the RPI was not a conveyance, but merely relinquished East Utah's contractual rights to the "participating interest" created under the 1973 Agreement, and (4) even if the RPI was a conveyance, the mother hubbard clause included in Exhibit "A" should not be construed as passing title to the Homestake Portion.

In contrast, Stichting's arguments are grounded in the mother hubbard language in Schedule "A" of the Uniform Real Estate Contract and Exhibit "A" of the RPI, as well as in the metes and bounds description in the escrow instructions. Their basic arguments are: (1) the merger doctrine does not apply because the parties did not intend the Lon Agreement to merge into the 1982 Special Warranty Deed, (2) even if the merger doctrine applies, all instruments must be read together to determine intent, (3) the merger doctrine does not preclude subsequent conveyances, and the RPI was a subsequent conveyance which transferred the Homestake Portion, (4) the parties intended the Homestake Portion to be conveyed, and (5) Hansen has no title to the surface rights in the Homestake Portion.

Although each party originally asserted title to the Homestake Portion through adverse possession, it is now agreed that material factual issues preclude that determination at this time.

### IV. *DISCUSSION*

#### A. *Stichting's Claim*

##### 1. *"Release of Participating Interest"*

■ As a preliminary matter, the court notes that the Release of Participating Interest must be construed in light of the fact that the Lon Agreement was not a single document, but instead was two related documents which were executed concurrently: (1) the 1973 Agreement, and (2) the Uniform Real Estate Contract. The purpose of the 1973 Agreement was "to confirm the understanding between East Utah and Lon whereby East Utah will be entitled to a participating interest over and above the consideration provided for in Exhibit "A" of the total project." *See* 1973 Agreement at p. 1. The Uniform Real Estate Contract was a contract for the sale of property.

In support of its argument that the RPI should be construed as a conveyance which passed title to the Homestake Portion

---

**15.** The summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553.

**16.** "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512.

through the mother hubbard language, Stichting points first to Utah Code Ann. § 57–1–13 [17] and notes that "the statutorily sufficient form of quitclaim deed contains only one word of conveyance—'quitclaims.'" *See* Stichting's Opposition Memo. at p. 17. Alternatively, Stichting argues that an examination of the words used in the RPI, its recitals, and other attendant facts show that the parties intended it to be a conveyance. *Id.* at p. 19. Hansen disagrees, asserting that the RPI was simply "a disclaimer of any continuing interest in the land arising out of the 1973 contract." *See* Memorandum in Support of Plaintiff Spenst Hansen's Second Motion for Summary Judgment at p. 5 (Mar. 1, 1995) [hereinafter "Hansen's Supporting Memo."].

■ In the court's opinion, Utah Code Ann. § 57–1–13 and the word "quitclaims" in the RPI are not dispositive.[18] Instead, the proper focus in determining whether the RPI should be construed as passing title is Stichting's alternative argument: "Each case stands on its own words, combinations thereof, recitals, and other attendant facts, having in mind the rule that generally the instrument is construed in favor of the grantee." *Meagher v. Uintah Gas Co.,* 123 Utah 123, 255 P.2d 989, 993 (1953).

Examined in this context, the court is not persuaded that the RPI "contains numerous recitals documenting the chain of title to the land that was the subject of the Lon Agreement and information concerning recording information that is irrelevant unless the Release was intended to convey land." *See* Stichting's Opposition Memo. at p. 19. In fact, the RPI's "chain of title" recital suggests that the listed parties have, in sequence, been responsible for the participating interest.[19]

Furthermore, "attendant facts" suggest that the RPI was not a conveyance. First, East Utah was obligated by the terms of the Uniform Real Estate Contract to convey the subject properties not by quitclaim deed, but instead by "good and sufficient warranty deed." *See* Uniform Real Estate Contract at ¶ 19. Further, after execution of the two deeds on October 8, 1982, Intramerican had completed conveyance—by warranty deeds— of twenty-six [20] out of twenty-seven of the properties actually named in the Uniform Real Estate Contract. It is therefore incongruous that Intramerican would execute yet another conveyance three days later, title it "Release of Participating Interest," and therein convey by *quitclaim* all previously conveyed claims, *plus* a vaguely described Homestake Portion.[21] Indeed, by that time Intramerican presumably was aware that it had already conveyed surface rights in the named tracts, and it is evident Stichting knew how to convey the Homestake Portion by metes and bounds description if it wanted to.[22]

---

17. Section 57–1–13 states that:
    Conveyances of land may also be substantially in the following form:
       QUITCLAIM DEED
    __ (here insert name), grantor, of __ (insert place of residence), hereby quitclaims to __ (insert name), grantee, of __ (here insert place of residence), for the sum of __ dollars, the following described tract __ of land in __ County, Utah, to wit: (here describe the premises).....
    Utah Code Ann. § 57–1–13 (1994).

18. Indeed, if there was complete reliance on § 57–1–13's prescription, the RPI might well fail to meet a "conveyance test" because it does not mention consideration—an integral part of the quitclaim deed form set forth in § 57–1–13. *See* Utah Code Ann. § 57–1–13 (1994).

19. Nor is the fact that the RPI was recorded persuasive. The recording of the RPI appears to have been a function of directions given in the escrow instructions, to which Stichting was a party, but Intramerican was not. Indeed, re-

cording can be understood in light of one of the stated purposes in executing the escrow instructions: "to assure that, upon consummation of the purchase, the title of Stichtings to the Property is free and clear of all ... impositions of any kind arising prior to or in connection with the Notes." *See* Escrow Instructions at ¶ 2.

20. Only the Horn Silver claim is missing.

21. Throughout this memorandum, the court mentions the mother hubbard language only for reasons of discussion or example, and makes no judgment as to its proper interpretation.

22. Tax records confirm that the metes and bounds description of the Homestake Portion was also within the knowledge of both East Utah and Intramerican. In these records, the Homestake Portion is always described by metes and bounds, whereas the other Lon Agreement tracts are listed by name. *See* Hansen's Supporting Memo. at Exhibit "P" (1972–1994 tax records).

Nor is it altogether clear that Intramerican considered the RPI to be a conveyance. When Intramerican "sold" its mining claim rights to Franco–Nevada in 1986, the deed was made "subject" to several other documents: (1) the Lon Agreement,[23] (2) the 1976 Special Warranty Deed, (3) the 1982 Special Warranty Deed, and (4) the 1982 Deed. *See* Deed to Mining Claims at p. 3. Taken together, these four sources name all [24] of the conveyed parcels, but do not include either a mother hubbard clause or a metes and bounds description of the Homestake Portion. Significantly, Intramerican did not make the deed "subject" to the RPI, which does include the mother hubbard language.

Most persuasive, however, is the fact that the "participating interest" derives from what appears to be a classic collateral agreement. Indeed, had Intramerican not "released" the participating interest, both it and its successors in interest might well have enjoyed continued entitlement to a share of the purchaser's profits despite the issuance of deeds to the Lon Agreement tracts. This premise is illustrated by *Baxter v. Stubbs,* 620 P.2d 68 (Utah 1980), decided two years before execution of the RPI, wherein the Utah Supreme Court affirmed that collateral agreements concerning the same subject matter will not necessarily merge into a deed. *Id.* at 69. In *Baxter,* the seller of a parcel of property had entered into an earnest money agreement with the buyers. By an addendum to the agreement, the buyers granted the seller a 25% " 'limited position in the limited partnership that is taking title.' " *Id.* at 68 (quoting addendum to earnest money agreement). When the seller executed a warranty deed conveying title to the property, that deed made no mention of the 25% interest. *Id.* Later, when the seller asserted a continuing right to the 25% interest, the buyers argued that the earnest money agreement and addendum had merged into the warranty deed, thus extinguishing the 25% interest. *Id.* at 68–69. On appeal, the Utah Supreme Court found no error in the trial court's determination that the parties had not intended the interest to merge into the

deed, and that the seller was therefore entitled to a continuing 25% interest in the partnership. *Id.* at 69.

The instant situation is similar to *Baxter.* Because the relevant deeds make no mention of it, it is conceivable that the participating interest would have continued in effect had the RPI not been executed. Thus, execution of a general release would be consistent with Stichting's stated purpose of assuring that its title be "free and clear" of any "imposition[ ] of any kind arising prior to or in connection with the Notes." *See* Escrow Instructions at ¶ 2.

To summarize, the court concludes that the RPI was not a conveyance, in light of the distinction between the 1973 Agreement and the Uniform Real Estate Contract, and after due consideration of the RPI's words, combinations of words, recitals, "other attendant facts," as well as the fact that the participating interest could be viewed as a collateral agreement that would not merge into final deeds. It was instead an acknowledgement that Intramerican relinquished any continued "interest" in tracts connected to the 1973 Agreement, thereby releasing Stichting from the obligation to remit a share of profits. In short, the document was exactly what it announced itself to be—a "Release of Participating Interest"—which term had clear meaning to the parties.

### 2. Construing Deeds

■ In light of the foregoing, it is clear that only three deeds passed title to the Lon Agreement tracts: (1) the 1976 Special Warranty Deed, (2) the 1982 Deed, and (3) the 1982 Special Warranty Deed. None of these deeds even arguably conveys the Homestake Portion, either by metes and bounds description or by mother hubbard language. Nevertheless, Stichting contends that when they are read together with the RPI, Schedule "A" of the Lon Agreement, and the metes and bounds description contained in the escrow instructions, "those instruments express the parties' intent to convey the

---

**23.** The Deed to Mining Claims names the Lon Agreement parcels which it is "subject" to. Neither the mother hubbard clause nor the metes and bounds description of the Homestake Por-

tion is included in this list. *See* Deed to Mining Claims at p. 3.

**24.** Again, the Horn Silver claim is not included.

[Homestake Portion] to Stichtings."[25] *See* Stichting's Opposition Memo. at p. 16.

The court disagrees. "Deeds are construed according to ordinary rules of contract construction." *Homer v. Smith*, 866 P.2d 622, 629 (Utah Ct.App.1993), *cert. denied sub nom. Homer v. Sandy Hills*, 878 P.2d 1154 (Utah 1994). When construing deeds:

> In the absence of ambiguity, the construction of deeds is a question of law for the court, and the main object in construing a deed is to ascertain the intention of the parties, especially that of the grantor, *from the language used.* The description of the property in a deed is prima facie an expression of the intention of the grantor and the term "intention," as applied to the construction of a deed, is to be distinguished from its usual connotation. When so applied, it is a *term of art* and signifies a meaning of the *writing. . . . [T]he intention of the parties to a conveyance is open to interpretation only when the words used are ambiguous.*

*Hartman v. Potter*, 596 P.2d 653, 656 (Utah 1979) (final emphasis added); *see also, Stichting*, 917 F.2d at 1246 ("One of the most basic rules of contract interpretation is that the intent of the parties to a written agreement is to be ascertained from the content of the instrument itself."); *Winegar v. Froerer Corp.*, 813 P.2d 104, 108 (Utah 1991) ("If the contract is in writing and the language is not ambiguous, the intention of the parties must be determined from the words of the agreement.")

Further, the interpretation process is a three-step sequence: .

> "In searching for the meaning the Court must *first* examine the language used in the instrument itself and accord to it the weight and effect which the instrument itself may show that the parties intended the words to have. If *then* its meaning is still ambiguous or uncertain, the Court may consider other contemporaneous writings concerning the same subject matter, and may, *if it is still uncertain,* consider parole evidence of the parties' intention."

*Mathis v. Madsen*, 1 Utah. 2d 46, 261 P.2d 952, 956 (1953) (emphasis added) (quoting and adopting language in trial court's memorandum decision); *see also Continental Bank & Trust Co. v. Bybee*, 6 Utah 2d 98, 306 P.2d 773, 775 (1957) (looking first to "four corners of document," if still ambiguous to contemporaneous writings on same subject matter, if still ambiguous to extrinsic parol evidence). "A contract provision is ambiguous if it is capable of more than one reasonable interpretation because of 'uncertain meanings of terms, missing terms, or other facial deficiencies.'" *Winegar*, 813 P.2d at 108 (quoting *Faulkner v. Farnsworth*, 665 P.2d 1292, 1293 (Utah 1983)).

Furthermore, parol evidence "may not contradict, vary, or add to deeds." *Neeley v. Kelsch*, 600 P.2d 979, 981 (Utah 1979).

It is clear to the court that the three deeds which arose out of the Lon Agreement are not ambiguous. Their terms are certain and clear, and there are no facial deficiencies or missing terms. By these tests, the parties' objective intent is certain. Thus, there is no reason to look to either contemporaneous documents such as the escrow instructions and RPI, or to prior documents such as the Lon Agreement in order to ascertain the parties' intent.

Moreover, the merger doctrine would preclude such action, particularly with regard to the Lon Agreement and escrow instructions. Under the merger doctrine, "when the acts to be performed by the seller in a contract relate only to delivery of title to the buyer . . . the deed is the final agreement and all prior terms, whether written or verbal, are extinguished and unenforceable." *Stubbs v. Hemmert*, 567 P.2d 168, 169 (Utah 1977). "The basis for imposing the doctrine of merger is 'not due to any peculiar sanctity attaching to the deed itself, but because it is regarded as the final repository of the agreement which led to its execution.'" *Secor v. Knight*, 716 P.2d 790, 792 (Utah 1986) (quoting 84 A.L.R. 1008, 1009 (1933)). "When the terms of the deed cover the same subject matter as the antecedent agreement, the

**25.** The major portion of Stichting's motion for summary judgment deals with arguments and various documents and affidavits which allegedly show the parties' intent to convey the Homestake Portion. *See* Memorandum in Support of Motion for Summary Judgment (Mar. 1, 1995).

deed controls." *Dobrusky v. Isbell*, 740 P.2d 1325, 1326 (Utah 1987). Thus, "acceptance of the deed by the buyer manifests his acceptance of [the seller's] performance even though the estate conveyed may differ from that promised in the antecedent agreement." *Stubbs*, 567 P.2d at 169; accord, *Embassy Group, Inc. v. Hatch*, 865 P.2d 1366 (Utah Ct.App.1993). Although the merger doctrine may appear to be harsh, it "serves the purpose of 'preserv[ing] the integrity of the final document of conveyance and encourag[ing] the diligence of the parties.'" *Embassy Group*, 865 P.2d at 1369 (quoting *Secor*, 716 P.2d at 795). Exceptions to the merger doctrine include fraud, mistake, and the "existence of collateral rights in the contract of sale." [26] *Secor*, 716 P.2d at 793.

■ Stichting's primary argument opposing merger is essentially that the court must consider whether the parties intended merger.[27] Stichting's Opposition Memo. at p. 10. However, the "intent" of the parties concerning merger is generally considered only when there is a question as to whether collateral terms have merged into the deed. *See Secor*, 716 P.2d at 793; *Baxter*, 620 P.2d at 69. As stated in *Stubbs*, "if the original contract calls for performance by the seller of some act *collateral to conveyance of title*, his obligations with respect thereto survive the deed and are not extinguished by it." *Stubbs*, 567 P.2d at 169 (emphasis added). There are no such disputes here. Therefore, as was aptly stated in *Secor*, "[a]s this case involves terms relating to title, which are not collateral, ... reliance on intent is misplaced." *Secor*, 716 P.2d at 793.

Alternatively, Stichting cites several cases and argues that even if merger applies, all substantially contemporaneous and interre-

lated instruments implementing the Lon Agreement must be construed together and harmonized. *See* Stichting's Opposition Memo. at p. 13. If this is done, Stichting contends, the parties' intent to convey the surface rights to the Homestake Portion is evident, particularly since the escrow instructions include the metes and bounds description of the Homestake Portion.

There are problems with this argument. First, to examine and harmonize contemporaneous documents in this case would be to ignore the merger doctrine as well as its purpose. Indeed, none of the deeds issued out of the Lon Agreement is ambiguous, the last of these deeds was issued nearly thirteen years ago, and there is no indication that others will be forthcoming. Thus, the court must assume that the parties' intent found final expression in those documents, and examination of "contemporaneous writings concerning the same subject matter" is unwarranted. *See Mathis*, 261 P.2d at 956 (declaring that courts must first determine meaning from language used in document, and "consider other contemporaneous writings concerning the same subject matter" only if that language is first found ambiguous or uncertain); *see also* 77 Am.Jur.2d *Vendor and Purchaser* § 290 (1975) (discussing merger doctrine and stating, "evidence of contemporaneous or antecedent agreements between the parties is inadmissible to vary or contradict the terms of the deed"); *Purbaugh v. Jurgensmeier*, 240 Neb. 679, 483 N.W.2d 757, 761–62 (1992) (same); *Elderkin v. Gaster*, 447 Pa. 118, 288 A.2d 771, 774 n. 11 (1972) (same); *Wallace v. Smith*, 205 Okla. 557, 240 P.2d 799, 803 (1951) (same). Further, to construe the escrow instructions in conjunc-

---

**26.** Defendants have not expressly argued any of these exceptions.

Furthermore, this is not an action for reformation. *See Grahn v. Gregory*, 800 P.2d 320, 324 (Utah Ct.App.1990), *cert. denied*, 843 P.2d 516 (Utah 1991) (recognizing mutual mistake as a basis for reforming an agreement).

**27.** Defendants cite *Baxter* for the proposition that the parties "must intend that the deed in question be in full execution of the prior agreement." Stichting's Opposition Memo. at p. 10. This is not completely accurate, however. *Baxter* states:

We do not question the general proposition that when a deed is executed pursuant to pre-

ceding contract of sale it is generally presumed to merge the rights existing under the contract. However, the rule is not so all-encompassing and exclusive *as to prevent the parties from having collateral agreements* concerning the same subject matter. As with any contract issue, the controlling inquiry is to determine the intention of the parties; and this includes the question of any merger.

*Baxter*, 620 P.2d at 69 (emphasis added). Thus, the question in *Baxter* was not the parties' intent concerning a title matter, but instead whether a collateral agreement merged into the deed.

tion with the deeds would effectively permit the instructions—to which Intramerican was not a party—to alter or vary the *unambiguous* deeds.

Moreover, the cases which Defendants cite in support of this argument are distinguishable. For example, title or merger are not at issue in some, reformation or collateral terms *are* at issue in others, and in yet others *agreements* are read together and harmonized because they specifically refer to each other.[28] In this case, however, both title and merger are at issue, the three deeds do not contradict each other, collateral terms are not at issue, reformation is not an option, neither fraud or mistake have been expressly argued, and the deeds do not refer to the escrow instructions.

## B. Hansen's Claim

For similar reasons, Hansen's argument in favor of summary judgment is also rejected. It is clear to the court that Mr. Proctor did not possess surface rights to the Homestake Portion and, thus, could not convey those to Hansen. The Mineral Deed with Reserved Rights which Mr. Proctor received from Euro–Nevada conveyed mineral rights only. As noted *supra*, this deed specified that the only surface rights granted were those "Grantor [Euro–Nevada] may have *for mining and associated operations*, if any, in, on or under [the listed mining claims.]" *See* Mineral Deed with Reserved Rights at p. 3 (emphasis added).

Despite this, Hansen argues that Euro–Nevada claims no interest in the Homestake Portion and "intended to pass all rights to Proctor." *See* Hansen's Reply to Defendant Stichting's Memorandum in Opposition to Hansen's Motion for Summary Judgment at p. 9 (Apr. 17, 1995) (citing Letter from M. Craig Haase, Vice–Chairman and General Counsel of Euro–Nevada, to Thomas W. Bachtell, Counsel for Plaintiff Hansen (Aug. 19, 1994) (attached as Exhibit "N" to Hansen's Supporting Memo.)). There is, however, no ambiguity in the subject Mineral Deed

---

**28.** For example, merger was not at issue in *Oberhansly v. Sprouse*, 751 P.2d 1155 (Utah Ct.App. 1988). At issue, instead, were two deeds executed on the same day by divorcing persons. The husband had been ordered by the court to convey one-half of the mineral rights in two properties to the wife. In the first deed, the husband conveyed the one-half mineral interest. In the second deed, which was recorded after the husband's, the wife conveyed all her interest in the two properties to the husband. *Id.* at 1155–56. Later, the ex-spouses jointly leased the exploration and mineral extraction rights to the property to Standard Oil. *Id.* at 1156. After the husband's death several years later, however, his second wife claimed the entire mineral estate based on the fact that the second deed was recorded last, and the trial court granted summary judgment in her favor. *Id.* at 1156. The appeals court reversed, finding that because the deeds were executed contemporaneously and were "clearly interrelated," they must be construed as a whole and harmonized, "if possible." *Id.* Thus, the trial court was directed to examine the "true purpose" behind the deeds.

In *Iadanza v. Mather*, 820 F.Supp. 1371 (D.Utah 1993) plaintiffs alleged that defendant had breached a sales agreement by failing to completely and accurately fill out a disclosure statement. *Id.* at 1386. Because the sales agreement referred to the disclosure statement, the court found that the parties intended that the disclosure statement be incorporated into the sales agreement and determined that the two documents should be " 'construed as a whole and harmonized, if possible.' " *Id.* (citations omitted).

In *Atlas Corp. v. Clovis Nat'l Bank*, 737 P.2d 225 (Utah 1987), the parties had signed both a sales agreement giving the seller a share of the profits, and an operating agreement which defined each parties' rights and obligations. *Id.* at 227. A mineral deed executed two months later conveyed the claims *subject to the terms of the two prior agreements*. The primary issue in the action was whether the interests in net profits described in the agreements was a "real property interest of perpetual duration" which was binding on the buyer's successors in interest. *Id.* at 228. Because the "agreements and the mining deed were executed substantially contemporaneously and [were] clearly interrelated," the court found that "they must be construed as a whole and harmonized, if possible." *Id.* at 229.

In *Winegar v. Froerer Corp.*, merger was not at issue and the two contemporaneous agreements which made up one assignment agreement were found to be "clearly interrelated," and were therefore construed as a whole and their meanings harmonized. *See Winegar*, 813 P.2d at 109.

In *Verhoef v. Aston*, 740 P.2d 1342 (Utah Ct. App.1987), a contract *reformation* action, the court construed a uniform real estate contract and escrow instructions together because they had been executed together. *Id.* at 1344. However, this was not a title action and the court pointed out that "prior negotiations and agreements merge into [a] final written agreement on the subject." *Id.*

**1518**

with Reserved Rights. Therefore, it would be inappropriate to admit this parol evidence.

## V. *ORDER*

For the foregoing reasons, and good cause appearing, IT IS HEREBY ORDERED as follows:

1. Plaintiff's motion for summary judgment is hereby DENIED.

2. Defendants' motion for summary judgment is hereby DENIED.

3. All parties are to bear their own costs.